MINNEAPOLIS STREET RAILWAY COMPANY v. CITY OF MINNEAPOLIS AND OTHERS.[1,2]

December 16, 1949.

No. 34,935.

[1]Reported in 40 N. W. (2d) 353.
[2]Appeal dismissed by U. S. Supreme Court March 13, 1950.

504

*John F. Bonner,* City Attorney, and *Palmer B. Rasmusson,* Assistant City Attorney, for appellants.

*Dorsey, Colman, Barker, Scott & Barber, Leland W. Scott,* and *Robert J. Johnson,* for respondent.

MATSON, JUSTICE.

Defendants appeal from a judgment on the pleadings in an action under the declaratory judgments act wherein a 1946 Minneapolis ordinance—purporting to amend an earlier street railway franchise grant by increasing the annual license fee for each car from $25 to $100—was held invalid and void.

Defendants are herein referred to collectively as the city and the plaintiff as the street railway. The following issues are raised: (1) The street railway has challenged the constitutionality—under both the federal and the state constitutions—of the 1946 ordinance, on the grounds that it impairs the obligation of a contract alleged to arise out of the original grant by the city, and in that it works a

deprival of property without due process of law. (2) Assuming that the original grant by the city to the street railway constitutes a contract, can the city thereunder, pursuant to an exercise of the police power, increase the annual license fee provided for therein without the consent of the street railway? (3) Further, did the enactment by the legislature of the so-called Brooks-Coleman Act (L. 1921, c. 278, codified as M. S. A. 220.01 to 220.19) deprive the city of any police power control over street railways which it had theretofore possessed?

A consideration of these issues requires an examination of certain legislative enactments, both municipal and state. In 1875, the Minneapolis city council enacted an ordinance[3] which granted to the street railway the exclusive right to construct, maintain, and operate a street railway system. This grant, which was accepted by the street railway, was ratified by the state legislature. Sp. L. 1879, c. 299. Section 8 of the 1875 ordinance states that the street railway in establishing passenger rates shall fix them in such amount as the city council may deem just and reasonable, "provided, that the city shall not reduce the passengers' fare below five cents over any one continuous line, * * *." Section 9 thereof reads as follows:

"Sec. 9. The Council of the City of Minneapolis hereby *reserves the right to make all necessary and usual police regulations concerning the operation and management of said street roads* during the continuance of the rights and privileges hereby granted." (Italics supplied.)

In 1890, the city council adopted another ordinance,[4] which, in modification of the original grant, authorized the street railway to use electricity instead of animals or pneumatic power to propel its cars. This latter ordinance in part provides:

"Sec. 7. This ordinance is *granted upon the express condition and requirement* that said Minneapolis Street Railway Company shall pay to the City Treasurer * * * *an annual tax or license fee*

[3]Passed July 9, 1875, and approved July 17, 1875.
[4]Passed June 27, 1890, and approved July 2, 1890.

*of twenty-five dollars ($25) per car for the average number of cars operated * * *.* [Italics supplied.]

"Sec. 8. In the construction, maintenance and operation of said lines of street railway said Minneapolis Street Railway Company, its successors and assigns, shall at all times be subject to all the conditions and limitations and other provisions of an ordinance entitled 'An Ordinance authorizing and regulating street railways in the City of Minneapolis,' passed July 9, 1875, and approved July 17th, 1875, as the same has been amended and is now in force, and all other ordinances of said city now in force or hereafter adopted, so far as applicable."

 Basic to a consideration of issues herein is the established legal proposition that the ordinance of 1875, together with the ratifying act of 1879, granting the right to construct, maintain, and operate a street railway system in the city of Minneapolis, constitutes a valid and subsisting contract between the city and the street railway and, *ipso facto,* between the state and the street railway. City of Minneapolis v. Minneapolis St. Ry. Co. 215 U. S. 417, 30 S. Ct. 118, 54 L. ed. 259. The ordinance of 1890 amending such contractual grant has been accepted, and relied upon by both the city and the street railway, and the material changes thereby effected were all within the scope of the provisions made in the original grant in recognition of the need for future change. It constituted a valid amendment of the contractual relation between the city and the street railway. See, Ordinance of 1875, §§ 4 and 9; City of Minneapolis v. Minneapolis St. Ry. Co. 215 U. S. 417, 30 S. Ct. 118, 54 L. ed. 259; and Minneapolis St. Ry. Co. v. City of Minneapolis (C. C.) 155 F. 989.

 Prior to, and separate and apart from a consideration of any changes that may have been effected in the contractual relation of the parties by the Brooks-Coleman Act, we proceed to determine what powers, if any, the city possessed and which could be exercised without impairing the obligations of the contract embodied in the ordinances of 1875 and 1890, to increase the annual license fee from $25 to $100 per car for the average number of cars operated. It is

conceded that if any power to do so exists it must be a police power. Whatever police powers the city possesses are those conferred upon it by the state. A municipality, though operating under a home rule charter, is merely a department of the state, a political subdivision created as a convenient agency for the exercise of such governmental powers as may be entrusted to it. Pursuant to Minn. Const. art. 4, § 36, the legislature may, by the enactment of *general laws,* modify or withdraw any powers entrusted to a city with a home rule charter. Monaghan v. Armatage, 218 Minn. 108, 112, 15 N. W. (2d) 241, 243. Apart from any grant to the city by virtue of the contract itself and the ratification thereof by the legislature, it is clear that since 1872 the city has been possessed of broad police powers. The following provisions, quoted in part from the home rule charter of the city of Minneapolis (adopted November 2, 1920), have been in effect in substantially their present forms since 1872, when they were first enacted by the state legislature as a part of Sp. L. 1872, c. X, subchapter I, § 1:

GENERAL POWERS

Chapter I, § 1. "* * * the 'City of Minneapolis,' * * * shall have all the general powers possessed by Municipal Corporations at common law, and in addition thereto shall possess all powers hereinafter specifically granted, * * *."

GENERAL WELFARE CLAUSE

Chapter IV, § 5. "The City Council shall have full power and authority to make, ordain, publish, enforce, alter, amend or repeal all such ordinances for *the government and good order of the city,* * * * as it shall deem expedient, * * * and all such ordinances are hereby declared to be and to have the force of law." (Italics supplied.)

SPECIFIC AUTHORIZATION TO INCREASE OR REGULATE
CARRIERS OF PASSENGERS

Chapter IV, § 5, subd. 31. "To license and regulate hackmen, draymen, expressmen, taxicab drivers *and all other persons engaged*

508

*in carrying passengers, baggage or freight, \* \* \*."* (Italics supplied.) [5]

■ A general welfare clause, substantially the same as the one above quoted, has been given a broad construction—as not limited by the specific enumeration of powers which follows it—by this court. In construing this clause in City of Duluth v. Cerveny, 218 Minn. 511, 517, 518, 16 N. W. (2d) 779, 783, we said:

"\* \* \* A city exercises police power within its jurisdiction to practically the same extent as the state itself. This power is not confined to the narrow limits of precedents based on conditions of a past era. Rather, it is a power which changes to meet changing conditions, which call for revised regulations to promote the health, safety, morals, or general welfare of the public. \* \* \*

\* \* \* \* \*

"Whatever the rule may be elsewhere, we are committed to a liberal interpretation of charter provisions as to the exercise of police power by municipalities concerning matters peculiarly subject to local regulation."

In State v. Sugarman, 126 Minn. 477, 479, 480, 148 N. W. 466, 467, 52 L.R.A. (N.S.) 999, a Minneapolis case, in holding that the city had the police power to regulate traffic under the general-powers and the general-welfare clauses above quoted, we said:

"\* \* \* The regulation of traffic upon the crowded thoroughfares of a large city is so imperative that a court should hesitate to deny that this is among one of the police powers granted to the same. \* \* \* certain matters are so intimately connected with the exercise of municipal government and control that we do not necessarily look for express legislative authority on the subject. It is implied. \* \* \*

\* \* \* \* \*

"\* \* \* There is no specific restriction, and the regulation of traffic on the congested streets of a large city is so bound up with

[5]See, Sp. L. 1872, c. X, subchapter IV, § 3, subd. 11, embodying the same phraseology except the words "expressmen" and "taxicab drivers."

the good order thereof that the authority, wherever found in the charter, should be held to grant the power so to do."

Our observations in that case are applicable to all forms of traffic, inclusive of streetcar operation.

The above-quoted paragraph (c. IV, § 5, subd. 31, of the city charter), providing for the licensing and regulating of those who carry passengers, speaks for itself. In Jefferson Highway Transp. Co. v. City of St. Cloud, 155 Minn. 463, 193 N. W. 960, an identical provision from the charter of the city of St. Cloud was construed to authorize the regulation and licensing of passenger buses. We see no sound basis for a holding that this provision is not equally applicable to streetcars. The form of the wheels of a vehicle, whether made to travel upon a common pavement or upon a steel track, does not determine its nature so much as the use to which the vehicle is put and for which it was designed. Both buses and streetcars are used to carry passengers. Frankford, etc., Ry. Co. v. City of Philadelphia, 58 Pa. 119, 98 Am. D. 242. The power of the city to license, as a means of regulation, also has been recognized by this court in Crescent Oil Co. v. City of Minneapolis, 175 Minn. 276, 221 N. W. 6.[6] Clearly, since 1872, the city of Minneapolis has been possessed of police powers sufficiently broad to authorize the regulation of all forms of vehicular traffic upon its streets, inclusive of the regulation and licensing of streetcars.[7]

In the absence of express authorization by the legislature, a municipal corporation cannot by contract surrender or curtail its police power. Gardner v. City of Dallas (5 Cir.) 81 F. (2d) 425; 62 C. J. S., Municipal Corporations, § 139; People ex rel. City of

---

[6]Reversed on other grounds in Crescent Oil Co. v. City of Minneapolis, 177 Minn. 539, 225 N. W. 904.

[7]Specific authorization for the care and supervision of streets is found in c. VIII, § 1, of the Minneapolis home rule charter. This section was formerly part of Sp. L. 1881, c. 76, which was enacted approximately nine years prior to the 1890 ordinance for the amendment of the original street railway act of 1875. See, 38 Am. Jur., Municipal Corporations, § 367, in re regulatory license power where city has regulatory power over streets and vehicles.

Chicago v. Chicago City Ry. Co. 324 Ill. 618, 155 N. E. 781. It is also the general rule that in issuing licenses as a means of police power regulation, a license fee—unless the right to charge such fee has been expressly surrendered in a manner authorized by legislative enactment—may be exacted to reimburse the city for the reasonable cost of issuing the license and for inspecting, supervising, and regulating the use which has been authorized.[8] A license fee under the police power may not be imposed for revenue purposes. In other words, the service for which the city may be reimbursed must be reasonably related to the police power function of inspection, supervision, and regulation. It is not fatal, however, that such license fee may incidentally yield some return in excess of the amount necessary to reimburse the city for its police regulatory service. Ramaley v. City of St. Paul, 226 Minn. 406, 33 N. W. (2d) 19; Johnson v. Philadelphia, 60 Pa. 445.

■ Plaintiff contends, however, that the exaction attempted by the 1946 amendatory ordinance is for the purpose of defraying the cost of services, which it maintains are clearly not related to the performance of any regulatory function under the police power. In other words, it is asserted that the proposed exaction is nothing more than a charge for franchise privileges already enjoyed by the street railway. It is true that the 1946 ordinance is so broad that it may be interpreted to cover services which are not properly related to the police power.[9] It is equally subject to interpretation

[8]City of St. Paul v. Dow, 37 Minn. 20, 32 N. W. 860, 5 A. S. R. 811; Jefferson Highway Transp. Co. v. City of St. Cloud, 155 Minn. 463, 193 N. W. 960; State ex rel. Remick v. Clousing, 205 Minn. 296, 285 N. W. 711, 123 A. L. R. 465; 1 Dunnell, Dig. & Supp. § 1608; 38 Am. Jur., Municipal Corporations, §§ 349 and 366; 3 McQuillin, Municipal Corporations (Rev. 2 ed.) § 1102; 4 McQuillin, Municipal Corporations (Rev. 2 ed.) § 1816.

[9]The 1946 amendatory ordinance, adopted February 8, 1946, reads in part as follows:

"Section 2. The foregoing amendment to Section 7 of the above entitled ordinance is made by the City Council in the exercise of its police power because of additional cost in connection with the inspection of street cars, additional municipal services made necessary and furnished the company in the operation of its street cars, and the additional traffic problems and

that it was intended to apply only to a proper police power purpose. Where a municipal ordinance is adopted which would be lawful if intended for one purpose and unlawful if for another, the presumption is that a lawful purpose was intended, unless the contrary clearly appears. Ramaley v. City of St. Paul, 226 Minn. 406, 33 N. W. (2d) 19; M. S. A. 645.17(3).

■ We come to the gist of the case. Does the 1946 ordinance, increasing the annual license fee from $25 to $100 to defray the cost of police power regulation, impair the obligations of the contract between the city and the street railway? Section 7 of the ordinance of 1890 specifically states that the grant is *made upon the express condition and requirement* that the street railway shall pay an annual tax or license fee of $25. Are we by a process of construction or implication to read into this provision a meaning that a larger license fee may not be imposed. We think not. In City of Minneapolis v. Minneapolis St. Ry. Co. 215 U. S. 417, 427, 30 S. Ct. 118, 121, 54 L. ed. 259, 268, involving another provision of the same contract, the court said:

"* * * *Statutes and ordinances of this character are not to be extended by construction,* nor should they be deprived of their meaning, *if it is plainly and clearly expressed.*" (Italics supplied.)

In that case, the court held a Minneapolis ordinance unconstitutional as impairing the obligations of contract, in that it provided for a fare of less than five cents when the contractual grant explicitly stated that the "city shall not reduce the passengers' fare below five cents * * *." In the instant case, however, we do not have language which plainly and clearly expresses an intent that the annual license fee shall not be increased. An exemption from an obligation to pay a license fee sufficiently high to defray the reasonable cost of police regulation, like an exemption from taxation, is a privilege of such high order and is so rarely granted that it can be

expense created by the greatly increased traffic upon the streets and avenues of the City, and is intended to be in addition to, and not a substitute for, other charges, such as paving between the tracks, snow removal, paving repair."

established only by the import of explicit language and not by implication or presumption. See, Ramaley v. City of St. Paul, 226 Minn. 406, 412, 33 N. W. (2d) 19, 22. Whatever is not unequivocally granted in franchise ordinances is taken to have been withheld, in that all such grants are to be strictly construed in favor of the public and against the grantee. Railway Co. v. Philadelphia, 101 U. S. 528, 25 L. ed. 912; Tilton v. City of Utica, 60 N. Y. S. (2d) 249; see, 62 C. J. S., Municipal Corporations, § 137. In Union Passenger Ry. Co. v. City of Philadelphia, 83 Pa. 429, 433, involving a similar issue, the court said:

"* * * The right of the state to impose such a tax, rate, or imposition in future, *cannot be taken away by a mere implication arising from a direction to pay a certain sum.*" (Italics supplied.)

The imposition of license fees, like taxes, entails one of the great functions of government, and the relinquishment of the power to discharge that function can be derived only from explicit and unequivocal language that is so free from ambiguity as to leave no room for construction. The holdings of the United States Supreme Court in similar cases are in accord. See, City of St. Louis v. United Rys. Co. 210 U. S. 266, 28 S. Ct. 630, 52 L. ed. 1054; New Orleans City & Lake R. Co. v. New Orleans, 143 U. S. 192, 12 S. Ct. 406, 36 L. ed. 121; Railway Co. v. Philadelphia, 101 U. S. 528, 25 L. ed. 912.[10]

■ We find no merit in the implied assumption that the exercise by the city of a licensing power for police regulation is necessarily inconsistent with the preservation of the street railway's franchise

---

[10]The decision of Boise, etc., Water Co., Ltd. v. Boise City, 230 U. S. 84, 33 S. Ct. 997, 57 L. ed. 1400, is to be distinguished, in that the license fee involved therein was in fact a rental charge for the use of streets in which a right of user had theretofore become the property right of the water company by an earlier ordinance. No question involving the taxing or the police power was considered.

We have not overlooked Tilton v. City of Utica, 60 N. Y. S. (2d) 249. The ordinance involved therein, by its express terms, went beyond the sphere of a police power function of regulation, inspection, and supervision. The reasoning therein is apparently based on prior decisions pertaining to the imposition of a license fee for revenue purposes.

privileges. In the first place, the power to license, which is a customary means of police regulation, was expressly reserved by the city as a part of the contractual grant. Secondly, the power to license is not always the power to deny, and thereby the power to destroy the franchise privileges granted, since the exercise of such power may be, as was done here, contractually restricted to the field of police power regulation, which is always subject to a judicially enforceable standard of reasonableness. See, Hunstiger v. Kilian, 136 Minn. 64, 161 N. W. 263.

 Finally, did the enactment of the so-called Brooks-Coleman Act[11] modify the city's police power control over the street railway? The act specifies that every grant theretofore or subsequently made by a city to a street railway shall be converted into an indeterminate permit when the street railway files with the city clerk its written declaration of consent to be bound by the act and a certificate thereof is filed with the secretary of state. Such declaration and certificate have been filed, and the rights of all parties to the grant must be determined in the light of the act.[12] M. S. A. 220.07 reads in part:

"* * * When such certificate shall be filed * * * such grant, *subject to the provisions of this chapter*, shall become an indeterminate permit to own, operate, manage, and control any street railway property, or any part thereof, within such city under the terms and conditions of the grant that shall have been theretofore made by the state or any such city and be then in force; but all of the terms, conditions, and obligations of such existing grant, *except as herein otherwise specifically provided*, shall continue in force so long

---

[11]See, L. 1921, c. 278, now M. S. A. 220.01 to 220.19.

[12]In the application of § 220.07, the consent of the city is wholly unnecessary, in that the city is merely a department or political subdivision of the state to which governmental powers have been entrusted and which powers, as embodied in a home rule charter, are, by the enactment of *general* laws (as distinguished from special) pursuant to Minn. Const. art. 4, § 36, subject to withdrawal or modification. Monaghan v. Armatage, 218 Minn. 108, 15 N. W. (2d) 241; see, 4 McQuillin, Municipal Corporations (Rev. 2 ed.) § 1803, at p. 1036.

as such indeterminate permit shall continue. Such indeterminate permit shall continue in full force unless and until the city shall acquire the street railway property of such street railway within the limits of such city, or unless terminated or modified by the legislature of the state as hereinafter provided." (Italics supplied.)

The italicized portion of the preceding statutory quotation reveals a legislative intent to make doubly certain that any grant converted thereunder to an indeterminate permit shall be preserved only to the extent that its terms are not in conflict with the specific provisions of the act as a whole, and that where any conflict appears the act shall govern. The wording of the act, as well as the legislative history surrounding its enactment, indicates a legislative intent not to give the railroad and warehouse commission complete control over street railways. Instead, the attempt has been made to combine state with local control—that is, commission regulation with that of the municipality—in such a manner as to secure the advantages of both.[13] The principal power which was stripped from the cities and villages and given exclusively to the commission was the power to determine passenger rates. § 220.10. See, City of Duluth v. R. R. & W. H. Comm. 167 Minn. 311, 209 N. W. 10. On the other hand, certain other enumerated rights of police power regulation were vested *exclusively* in the council of *any* city of the state pursuant to § 220.09. In its use of the word "exclusive," the legislature has indicated the care with which it proceeded to divide the field of street railway regulation between the commission and local authorities. Cf. §§ 220.09 and 220.10. The act is a remedial measure and should be liberally construed to effect its purpose of making available to all municipal street railway systems coming under its scope the advantages of both commission and local control. In respect to the sphere of municipal regulation, we cannot agree that by becoming subject to the act the terms of the franchise grant were frozen so that no change could be made in the annual license fee. Any so-called "freezing" of terms could reasonably apply only to

[13]See, Hanft, *Control of Public Utilities in Minnesota,* 16 Minn. L. Rev. 457, 500 to 503.

the grant *as a whole,* and this necessarily included the right reserved by the city under § 9 of the 1875 ordinance to make all necessary and usual police regulations concerning the operation and management of the street railway during the continuance of the grant. In other words, the *continuing* right of the city to make such police regulations was preserved, except insofar as that right was modified by the specific terms of § 220.09, which became paramount in defining and limiting the nature and scope of such regulatory power. Agreeable to the police power principles hereinbefore discussed, we find nothing in § 220.09 to indicate a legislative intent to deprive the city of the right to issue licenses and to impose a reasonable license fee as one of the customary and inherent aspects of police power regulation. Section 220.09 simply defines the field of local regulation and not the manner of its exercise.

The city errs in its contention that the street railway's motion for judgment on the pleadings has resolved in its favor all fact issues, such as the reasonableness of the license fee. A motion for judgment on the pleadings has the same effect as a general demurrer, and *for the purposes of the motion* admits as true all facts well pleaded by the opposite party. Vogt v. Ganlisle Holding Co. 217 Minn. 601, 15 N. W. (2d) 91. The significance of the qualifying phrase *for the purposes of the motion* is not to be overlooked. An admission for the purposes of the motion is not an admission for the purposes of *all* future proceedings. The real position of the party moving for judgment is that *if* the allegations of the opposite party be true in fact they are, nevertheless, insufficient in law. Admissions by one who moves for judgment on the pleadings are admissions for the purposes of the motion only, and, if the motion is denied or if the motion is granted and later reversed on appeal, the movant is not concluded from trying any issue of fact. See, Conway v. Elgin, 38 Minn. 469, 38 N. W. 370; Schommer v. Flour City Ornamental Iron Works, 129 Minn. 244, 152 N. W. 535; Cammann v. Edwards, 340 Mo. 1, 100 S. W. (2d) 846; Vaughan v. Omaha Wimsett System Co. 143 Neb. 470, 9 N. W. (2d) 792.

516

It follows that the enactment by the city of the 1946 ordinance for the increase of the annual license fee per car from $25 to $100—subject, however, to a determination that such increase is necessary to defray the reasonable cost of police power measures and regulations *as authorized by* § *220.09*—constituted a valid exercise of its police power, which did not impair any obligations of contract or work a deprivation of any property rights in violation of either the federal or state constitutions.

The judgment of the trial court is reversed.

Reversed.

---

[1] Reported in 40 N. W. (2d) 342.