# MINNEAPOLIS STREET RAILWAY COMPANY v. CITY OF MINNEAPOLIS AND OTHERS.[1]

February 29, 1952.

No. 35,471.

See, Minneapolis St. Ry. Co. v. City of Minneapolis, 229 Minn. 502, 40 N. W. (2d) 353.

*John F. Bonner,* City Attorney, and *Charles A. Sawyer* and *Palmer B. Rasmusson,* Assistant City Attorneys, for appellants.

*Fred A. Ossanna,* General Counsel, *Dorsey, Colman, Barker, Scott & Barber, Leland W. Scott,* and *Robert J. Johnson,* for respondent.

MAGNEY, JUSTICE.

Prior to the going into effect of an amendatory ordinance adopted by the city council of Minneapolis on February 8, 1946, the city imposed upon the street railway company a license fee of $25 per year for each streetcar operated by the company. The $25 license fee was provided for in an ordinance adopted in 1890 and has been paid every year since that time. The amendatory ordinance im-

[1]Reported in 52 N. W. (2d) 120.

110

posed a fee of $100 per year per streetcar for the average number of cars operated by the company during the preceding year. The street railway company sought a declaratory judgment that the amendatory ordinance imposing an additional $75 for each street-car was invalid. On a former appeal, Minneapolis St. Ry. Co. v. City of Minneapolis, 229 Minn. 502, 40 N. W. (2d) 353, we held that the amendatory ordinance constituted a valid exercise of the police power of the city, which did not impair any obligations of contract or work a deprivation of any property rights in violation of either the federal or the state constitution, subject, however, to a determination that such increase is necessary to defray the reasonable cost of police power measures and regulations (229 Minn. 516, 40 N. W. [2d] 362) *"as authorized by* [M. S. A.] § *220.09."* This section will be quoted and considered later. This court remanded the case for further proceedings along the line indicated. After such proceedings had been held, the trial court determined that the license fee of $100 per car as provided by the amendatory ordinance is unreasonable and excessive and hence invalid, illegal, and void. Judgment was thereupon entered in conformity with the court's determination, and the city and its officers have appealed therefrom.

The matter was submitted to the court on a written stipulation of facts, together with certain exhibits received in evidence. No oral testimony was taken.

The validity of the amendatory ordinance of 1946 is attacked by the company on the ground that the license fee provided therein is unreasonable and excessive, that the amounts which the city would collect under the $100 per year license fee provision bear no reasonable relation to the cost to the city of issuing the license and the investigation, supervision, regulation, and surveillance of the conduct and operation of the business of the company.

This appeal presents the question reserved on the first appeal. More specifically, it presents for determination the issue of what particular costs of police power measures and regulation are relevant to a consideration of the reasonableness of the license fee. In

our previous opinion (229 Minn. 515, 516, 40 N. W. [2d] 362) we held, as stated, that the amendatory ordinance constituted a valid exercise of the police power of the city, subject, however, to a determination that such increase is necessary to defray the reasonable cost of police power measures and regulations *"as authorized by § 220.09,"* and we also said that the specific terms of § 220.09 became paramount in defining and limiting the nature and scope of such regulatory power.

M. S. A. 220.09 details the rights, power, and authority of the council of any city of this state in connection with street railways. One of its provisions reads as follows:

"* * * The council shall have authority to prescribe reasonable requirements, standards, and conditions of service and operation of any street railway property by any street railway within such city, and shall have the right at all times and in all respects to exercise reasonable control over such service and operation and all things pertaining thereto, including type of cars, the right to fix and amend service schedules, to control stops, routes, headway, speed, and number of cars, and to make regulations governing their lighting, heating, and sanitary condition, and such street railway shall furnish the council such information relating to such matters as it may from time to time require and operate at all times at least a sufficient number of cars to fully comply with all schedules and routes required by the council, and adequately accommodate the traveling public, and in these and all other respects furnish reasonable and adequate service and facilities for the accommodation of the traveling public."

The only part of above statute which may be broad enough to cover the questions involved on this appeal is the one which provides that the council shall have the right to "exercise reasonable control over such service and operation and all things pertaining thereto, including * * * ." The detailed inclusion which follows has no bearing on our problem. The authority to prescribe and to exercise reasonable control over such service and operation does not

cover such expenses as are here claimed by the city to have been incurred in its supervision and surveillance of streetcars, as will be pointed out later. In other words, the *cost* of the services claimed by the city is not incurred in the performance of the police power measures authorized by § 220.09.

In 1946, the company paid to the city $9,375 in payment of the annual license fee for that year at the rate of $25 per car. If payments had been made as called for in the amendatory ordinance, the amount would have been $37,500, or an additional sum of $28,-125. The city claims that the costs to the city for the regulation of the company surpass the total amount it would receive from a license fee of $100 per car.

In support of its claim, the city submitted a survey made by a research engineer. The costs to the city, as reported by Nathan Harris, the research engineer, in regulating the company, are as follows:

(1) The cost of the office of Transportation Service Inspection in the sum of $2,296, which is one-half the total cost of the office. The city employs a full-time inspector of streetcars and buses. Half the total cost of this inspection service was allotted to supervision of the street railway. The company concedes the propriety of this regulatory expense.

(2) The estimated cost of street traffic maintenance expense in the sum of $8,750 annually. The city provides and maintains 300 metal streetcar stop signs. It furnishes and maintains streetcar safety zone standards in the loop and paints yellow safety island lines on the pavement between safety zone standards and on the curb at streetcar stop corners.

(3) The estimated cost of police protection and assistance at almost 40,000 hours for a total of $56,730 per year. A breakdown of this item is as follows:

(a) Placing and removing safety zone standards, $6,365.

(b) Loop district traffic officers, $25,243. This item covers one-half the cost of foot traffic men stationed at streetcar intersections

throughout the loop, whose activities consist of handling streetcars, streetcar passengers, and streetcar traffic problems.

(c) Precinct traffic officers, for a total of $15,431. This item covers precinct officers who are assigned to streetcar intersections, where they assist in loading and unloading or facilitating the movement of cars.

(d) Owl-car lineup, for a total of $2,349 per year. Men and squad cars are assigned to Fifth street and Hennepin avenue each night from 12:30 a. m. to 2 a. m. for the sole purpose of maintaining order among the streetcar patrons waiting for the lineup.

(e) Special events, for a total of $3,903 per year. This covers the services of policemen assigned specially to assist in loading and unloading streetcars and facilitating streetcar traffic at special events such as football and baseball games, events at the auditorium, Aquatennial parade, and special church services.[2]

(4) Loss of parking-meter revenues, for a total of $17,010. In zones where parking meters have been established, there is a 60-foot "No Parking" zone at each streetcar stop corner, resulting in the absence of parking meters at such places.

---

[2]The Harris report interprets the meaning of the term "facilitating street car movement," as used in items (b), (c), and (e) as follows:

"* * * helping patrons board and alight from street cars; providing safe movement for patrons from curb to street car and from street car to curb; keeping street car loading zones free of other vehicular traffic; providing protection for patrons waiting in safety zones; keeping all other traffic including pedestrians, automobiles, and trucks moving so as not to impede streetcar traffic; directing traffic to prevent intersections from becoming congested to a point where through traffic including street car can not pass thru; holding up motorized traffic to provide safety for group loading and unloading of street cars; directing slow moving traffic to the right hand side of the road rather than on the street car tracks; redirecting motorized traffic in congested areas to streets on which the street cars do not operate; giving special assistance to the blind and crippled in boarding and alighting from street cars; holding up motorized traffic to permit street cars to make turns at certain intersections; and regulating pedestrian traffic so as not to impede street cars."

In addition to the above-estimated expenditures, the city claims estimated prospective expense in the sum of $10,625 on the part of the health department for the inspection of streetcars from the standpoint of public health—testing them for harmful gases, checking for overcrowding, and making general sanitary inspections.

A stipulation between the parties relative to the duties of the transportation service inspector sets out that part of his duties consists of the checking of streetcars as to excess loading and recommendations on conditions of streetcars. It seems that the latter might even include "testing [cars] for harmful gases." Thus, in greater part the activities suggested for the health department overlap the duties now performed by the transportation service inspector. But in addition to that the parties stipulated that—

"no officials, officers, departments or agencies of City of Minneapolis, other than transportation service inspector, street traffic maintenance department and police department referred to in Defendants' Exhibit lettered 'B', and City Clerk, City Comptroller, City Council, City Attorney, City Treasurer, Mayor's Office and the Civil Service Commission, supervised or rendered services to plaintiff which can in any way be construed as warranting the conclusion that some part of their costs may properly be included in the computation of the cost to defendant City of licensing plaintiff."

It is evident from the stipulation, aside from the duplication of functions, that no consideration can be given the prospective expense to the city on the part of the health department from the standpoint of public health.

The court found that the city incurred no cost in issuing the license, and that all claimed costs, except half the total cost of the office of transportation service inspector, were—

"mere estimates of a portion of the cost of general services to the public which cannot be found to be directly or even remotely attributable to the cost of supervising the operation of plaintiff's business or to the determination of plaintiff's qualifications to operate its business or to a determination as to whether plaintiff is

complying with the terms and conditions of the grant under which it operates its business," and that the $100 annual fee is unreasonable and in excess of the cost of supervision and regulation of the business.

We shall consider, in the order in which they have heretofore been enumerated, the items of expense which the city claims it is incurring in connection with the regulation of the company. As the cost of the office of transportation service inspector in the sum of $2,296 is conceded as a proper regulatory expense, nothing more need be said about it.

Next to be considered is the estimated cost of $8,750 to the city in maintaining 300 metal streetcar stop signs and safety-zone standards in the loop and the painting of yellow lines on the pavement between safety-zone standards and on the curbs at streetcar stop corners. The test is whether such costs are incurred in regulating the company. These activities are of fairly recent origin. They grew out of the necessity of regulating our ever-increasing vehicular traffic. Of course, they did not exist when in 1890 the $25 license fee was imposed. The number of streetcars operated in Minneapolis decreased from 548 in 1920 to 444 in August 1946, while the number of automobiles increased from 49,868 in 1920 to 133,-288 in August 1946. The activities above enumerated have been undertaken as safety and convenience measures. The safety measures, such as providing and maintaining safety-zone standards and the painting of yellow lines between such standards, have not been adopted by reason of any dangers arising from the operation of the streetcars, but from the dangers arising from the operation of automobiles. They are not a regulation of streetcar transportation, but a regulation of automobile traffic as a safety measure for the protection of streetcar patrons.

The well-known safety zones or islands on University avenue in St. Paul—which are passed by interurban cars of the company here involved—with their large concrete blocks equipped with warning lights placed at the end of the safety zone nearest approaching

vehicular traffic, well illustrate the source of the danger from which patrons of the company must be protected. The danger does not arise from the operation of the streetcars, and the protection afforded is not against moving streetcars but against other vehicular traffic. The expense of providing this safety measure is not incurred in connection with a regulation of the operation of streetcars, but an expense incurred in connection with the safety of streetcar patrons on foot who intend to become streetcar passengers and to whom vehicular traffic is a menace. The benefits of these areas are enjoyed by pedestrians and are a service rendered to the public. Again, it is not a danger from the operation of streetcars that necessitates safety zones and curb zones. If the cost incurred by the city for this service is not incurred in the regulation of streetcar traffic, it should, of course, not be charged against the license fee. The curbs have not been painted yellow as a regulation of streetcar transportation, since streetcar tracks are as far from the curbs as the width of the street permits, but as a convenience and a safety measure for the benefit of pedestrians who expect to become streetcar passengers.

In State ex rel. St. P. M. & M. Ry. Co. v. District Court, 42 Minn. 247, 44 N. W. 7, 7 L. R. A. 121, where a new public highway was laid out across the track and right of way of a railroad company, the court denied compensation to the company for providing and maintaining cattle guards and signboards at a new crossing, but allowed compensation for planking the roadway where it crossed the tracks, and for maintenance of the planking. The court said that the necessity for cattle guards and signboards arose out of the dangerous nature of the use of the railroad property, and that as a matter of police regulation the state had the power to impose upon railroad companies the duty of maintaining these safeguards. The dangerous situation arose entirely from the operation of trains upon the tracks and from no other cause. Here, the dangerous situation which prompted the creation of safety zones and the installation of safety standards did not arise from the operation of streetcars, but from the vehicular traffic on the streets. As to the plank-

ing, the court in State ex rel. St. P. M. & M. Ry. Co. v. District Court, *supra,* said that it had little if anything to do with the operation or safety of railway trains. It said that the planking was a necessary provision for the convenience of travelers on the highway, and that the railroad company was entitled to compensation for the expense of providing and maintaining the planking.

The next item is the estimated cost of police protection and assistance estimated at $56,730. This includes the services of loop traffic officers and police officers in putting up and taking down safety-zone standards, the time consumed in investigating streetcar accidents, and services furnished in connection with owl-car lineups, special events at the state university, auditorium, and ball park, and at football games and church celebrations. In our opinion, the expense of the above-described activities is not incurred in the regulation of streetcar traffic and the surveillance of the activities of the company; therefore, it should not be included as an item to be charged to the license fee.

Every day safety-zone standards are put up in the morning and removed in the evening by the police department. They are taken down and removed not because of any danger of their being knocked down by streetcars, but because they are continually being struck by automobiles and thus become a traffic hazard to street travel. As far as the streetcars are concerned, the standards would remain undisturbed, and there would be no necessity for taking them down after they once had been set up. They are set up as a protection against vehicular traffic and removed because of danger caused by vehicular traffic. The expense connected with the setting up and removal of these standards is not incurred in the regulation of streetcar traffic, but is directly related to traffic control as a safety measure provided for the patrons of the company against the dangers of vehicular traffic.

The Harris report estimates an annual cost of $46,926 for the services of loop and precinct traffic officers in "facilitating street car movement." The traffic officers are placed at intersections to facilitate and direct *all* traffic—streetcar, vehicular, and pedestrian.

The expense is not incurred in "facilitating street car movement" as such. The expense is incurred in the exercise of the general duty to expedite safe travel on the streets. It is imperative that a large city regulate traffic in its congested areas, but why the street railway should be charged 50 percent of the cost of such regulation, as the Harris report suggests, is not so clear, since all the different elements—streetcars, pedestrians, and vehicles—combine to create the congestion. As a matter of fact and as an illustration, on May 22, 1946, according to the stipulation in this action, there were 24,972 automobiles in the loop. Naturally, streetcars contribute their share to the congestion. But why the other contributors to the congestion should pay for the regulation through taxation and the street railway company should pay for it through taxation *plus* an additional amount as a license fee is not apparent. For the years 1940 to 1946, inclusive, the city of Minneapolis received out of the personal property tax paid by the street railway company an average of $305,615.08 per year. In passing, it should be said that in 1946 the company paid an annual paving and street-clearing cost amounting to $391,644.62.

The estimated cost of $2,349 to maintain order in the owl-car lineup is not a regulation or supervision of the operations of the street railway. It is a cost incurred in preserving the peace against persons who may become disorderly upon the streets of the city late at night while awaiting transportation.

The cost of traffic direction at special events in the sum of $3,903 is the same sort of cost as that considered above under "facilitating street car movement," and, in our opinion, is not a proper charge against the license fee.

Loss of parking-meter revenues, in the amount of $17,010 annually, is claimed by the city as a proper element of cost to be recovered through the imposition of the license fee. The figure is reached upon the basis of the 60-foot "No Parking" zone at all streetcar stops in the parking-meter areas. Section 11 (F) (6) (7)

of the street traffic regulation ordinance, passed April 8, 1938,[3] prohibits parking within 20 to 30 feet of intersections, so that 20 to 30 feet would in any case be unavailable for parking meters.

We have already considered the cost of painting the curb yellow to designate the "No Parking" zone, and what we there said about that cost and the purpose of "No Parking" zone applies equally to the loss of parking-meter receipts. The zone is not established as a regulation of the street railway company, but for the purpose of convenience and safety of its patrons, who at that point have not reached the status of passengers.

Where, as here, the municipality has power to regulate the operations and conduct of a business enterprise, it has also the power to license it. City of St. Paul v. Dow, 37 Minn. 20, 32 N. W. 860. But the power to regulate and license is not a power to license for purposes of revenue and thus to tax. In City of Mankato v. Fowler, 32 Minn. 364, 366, 20 N. W. 361, 362, we said:

"* * * What is a reasonable license fee must depend largely upon the sound discretion of the city council, having reference to all the circumstances and necessities of the case. The general rule is that a reasonable license fee should be intended to cover the expense of issuing it, the services of officers, and other expenses directly or indirectly imposed. Unless, however, the amount is manifestly unreasonable, in view of its purpose as a regulation, the court will not adjudge it a tax."

In State v. Finch, 78 Minn. 118, 122, 80 N. W. 856, 857, 46 L. R. A. 437, Mr. Justice Mitchell said:

"* * * Usually the amount of the license fee should be limited to the cost of issuing the license, and the probable expense of police supervision of those engaged in the business. * * * There are some kinds of business which are liable to become public nuisances,— as, for example, hawking and peddling, and the sale of intoxicating

[3]Repealed and reënacted by ordinance of April 14, 1950, effective April 19, 1950. See, Minneapolis Charter and Ordinances (Perm. ed.) 9:1-1106, 9:1-1107.

120

liquors,—and which for that reason may, in the proper exercise of police power, be restricted by the imposition of a license fee much in excess of the cost of the license and of police supervision. * * *

"* * * and the courts will not interfere with their action unless it is palpably manifest that the amount charged is excessive, or that the distinctions made are purely arbitrary."

In Village of Minneota v. Martin, 124 Minn. 498, 500, 145 N. W. 383, 384, 51 L.R.A.(N.S.) 40, we said:

"It is well settled that * * * a license fee may be of sufficient amount to include the expense of issuing the license and the cost of the necessary police surveillance connected with the business or calling licensed."

The validity of the license fee is presumed in the absence of evidence or facts of which the court may take judicial notice to the contrary. State ex rel. Remick v. Clousing, 205 Minn. 296, 285 N. W. 711, 123 A. L. R. 465. The business of operating a street railway, though properly subject to control, is not the kind of a business which is likely to degenerate into a public nuisance. The ordinance here involved must stand or fall upon consideration of the detailed items of expense above enumerated in determining the reasonableness or unreasonableness of the $100 license fee. This the parties concede.

In our first opinion in this matter (Minneapolis St. Ry. Co. v. City of Minneapolis, 229 Minn. 510, 40 N. W. [2d] 359) we said:

"* * * It is also the general rule that in issuing licenses as a means of police power regulation, a license fee—unless the right to charge such fee has been expressly surrendered in a manner authorized by legislative enactment—may be exacted to reimburse the city for the reasonable cost of issuing the license and for inspecting, supervising, and regulating the use which has been authorized. A license fee under the police power may not be imposed for revenue purposes. In other words, *the service for which the city may be reimbursed must be reasonably related to the police power function*

*of inspection, supervision, and regulation.* It is not fatal, however, that such license fee may incidentally yield some return in excess of the amount necessary to reimburse the city for its police regulatory service." (Italics supplied.)

The city relies on Jefferson Highway Transp. Co. v. City of St. Cloud, 155 Minn. 463, 193 N. W. 960, where the court said that a substantial license fee imposed by ordinance was not shown to be excessive. The court stated that the record sustained the finding that the yield from all license fees provided for by the ordinance would, in all probability, not be sufficient to pay the actual cost of proper regulation and policing of the businesses licensed thereunder. The court did not indicate of what the regulation and policing consisted, but did say (155 Minn. 469, 193 N. W. 962) :

"* * * In view of the finding that the proceeds from the fees that may be collected under this ordinance will no more than cover the expense of its enforcement, there is not much merit in the claim that the fees are excessive."

It continued (155 Minn. 469, 193 N. W. 962) :

"A municipality having power merely to license and not tax may fix a fee sufficient to cover the cost to enforce the regulation. This includes the added cost for policing the business. Why may it not also include the additional expense of the added wear and tear the business causes to the paved streets of the city?"

It further said (155 Minn. 470, 193 N. W. 963) :

"* * * It may also be true that conditions have changed since the decision in State v. Finch [78 Minn. 118, 80 N. W. 856], supra, was rendered, and that, as to transportation for hire within a city, the time has arrived when, as to certain features thereof, the regulation and license fee may partake of a repressive nature to some extent."

The transportation company involved operated interurban buses. The city had no power to tax the company, but did have the power to license it. The company used the streets and the other municipal

facilities without contributing to the expense by way of a tax. The court thought the additional expense of the added wear and tear which the business caused to the paved streets of the city should be included in the license fee. Finally, it thought that the business might develop into a nuisance, and that the high license fee might partake of a repressive nature. From the above analysis of the Jefferson Highway Transportation Co. case, it is evident that it stands alone on its peculiar facts. The no-tax feature, the street-damage feature, and the nuisance feature of the Jefferson case are not present in the instant case, and, as an authority, it cannot be relied on when considering the facts here presented, upon which a decision must be based.

The imposition of a $100 annual license fee upon the average number of streetcars operated by plaintiff would create a revenue for the city of $37,500 annually. This amount bears no relation to the costs shown here to be incurred by the city in the exercise of its statutory power to regulate, control, and supervise the operation of the street railway. The findings of fact of the trial court that the license fee is unreasonable and excessive are supported by the evidence.

Judgment affirmed.