# CITY OF ST. PAUL v. ST. PAUL CITY RAILWAY COMPANY.

82 N. W. (2d) 369.

April 5, 1957—No. 37,062.

*Clarence O. Holten* and *James S. Eriksson,* for appellant.

*Marshall F. Hurley,* Corporation Counsel, and *Robert E. O'Connell,* Assistant Corporation Counsel, for respondent.

MATSON, JUSTICE.

Appeal by defendant, St. Paul City Railway Company, from a declaratory judgment declaring the respective rights of defendant and of plaintiff, City of Saint Paul, in the Selby Avenue tunnel and that portion of Selby Avenue occupied by the tunnel and formerly used by the defendant for a street railway line. For convenience, plaintiff will hereinafter be designated as the city and the defendant as the street railway.

The tunnel is located on, and within the boundaries of, that portion of Selby Avenue which extends from Third Street to a point just west of Summit Avenue. Both parties concede that the tunnel has at all times been located on land acquired by the city and used and dedicated as a public street.

The trial court adjudged the rights of the parties as follows:

(1) That all right, title, interest, possession, use, and control of and to the Selby tunnel is vested in the city in trust for the public for public street purposes;

(2) That the street railway has no greater right, title, or interest in and to the tunnel than any member of the traveling public, except that it shall have three months' time in which it must remove its rails, ties, wires, electrical installations, etc. from the tunnel structure without doing any unnecessary damage to said structure; and

(3) That the defendant is under legal obligation to restore Selby Avenue to substantially the same condition it was in prior to the erection of the tunnel, but because it would be impractical to remove

the tunnel structure and restore the street to such condition, the court refrained from so ordering.

Upon this appeal we have issues as to (1) whether the question of the street railway's obligation to restore Selby Avenue to its prior condition was either pleaded or litigated by consent, (2) and, if the foregoing issue was properly litigated, whether the court erred in its conclusions thereon, and (3) whether the court erred in concluding that all right, title, and interest in and to the tunnel and the tunnel structure is vested in the city.

Before considering these issues we turn to a fuller statement of the facts. In 1872 a franchise to operate street railway lines in St. Paul was given to 18 citizens by ordinance. In 1886 the street railway, which had acquired the franchise, was granted authority to operate a street railway cable line on Selby Avenue. On March 2, 1905, by resolution of the city council and an acceptance in writing by the street railway, it was agreed that the street railway, *at its sole expense,* should within three years tunnel the Selby Avenue hill if it was practical from an engineering standpoint. The tunnel was completed in 1907 at a cost in excess of $415,000. The 1905 agreement did not state in whom title to the tunnel or tunnel structure should be vested. In fact no other agreement or statement was ever made concerning the allocation of title. The city council, however, by a resolution adopted in 1907, accepted the tunnel as being in full compliance with the agreement of 1905. The 1907 acceptance resolution contained a proviso that the street railway "shall restore and pave the street torn up for the construction of said tunnel at such time and in such manner as the Commissioner of Public Works shall direct."

Streetcars were operated through the Selby tunnel until 1953 when street transportation was converted from streetcars to buses. In that year the city, by resolution of the city council, accepted the proposal of the street railway that it discontinue and abandon streetcar service on Selby Avenue and that it be permitted to substitute motor buses over a route other than through the tunnel. Since that time the tunnel has not been used by the street railway for any purpose.

We need not consider whether the pleadings encompass the issue of the street railway's obligation to restore Selby Avenue to its condition prior to the construction of the tunnel since it clearly appears, from presentations made by counsel to the trial court, that the issue was in any event litigated by consent.

■ Before considering the question of the nature and extent of any obligation to restore the street to its former condition, we turn to the basic issue of title to the tunnel structure and then to the right of user of the tunnel. In resolving the issue of title, we shall further examine the city council resolution of 1905 which resulted in the building of the tunnel. In that year the street railway, in an action against the city in the Federal court, was awarded a decree in its favor. In consequence thereof, and in recognition that an end of litigation would be advantageous to both parties, the city by its 1905 resolution stipulated not to appeal the decree if the street railway would perform certain agreed-upon improvements and line extensions. One of the agreed-upon improvements was the tunneling of the Selby Avenue hill. As already noted, neither the 1905 resolution nor the acceptance resolution of 1907, nor any other agreement, contained any reference bearing upon the allocation of title to the tunnel structure which the street railway built upon and within the confines of a public street.

No prior decision of this court has dealt with title to a tunnel structure built upon a dedicated public street by a public transportation utility operating under a franchise or an indeterminate permit. In Bruer v. City of Minneapolis, 201 Minn. 40, 275 N. W. 368, we have, however, a decision involving the title to a bridge constructed on a public street in Minneapolis. The city of Minneapolis and the street railway company combined to build a bridge across a creek in order to extend streetcar service beyond the creek over and along Bryant Avenue. The bridge was built at a cost of $69,000 and of that sum the Minneapolis Street Railway Company paid $50,000 and the city paid $19,000. No vehicular traffic other than streetcars was permitted on the bridge. A landowner whose property was injured by a resulting change of street grade brought suit against the city

of Minneapolis and against the Minneapolis Street Railway Company. The city paid the landowner $2,150 for a covenant not to sue, and the action proceeded against the Minneapolis Street Railway Company alone on the theory that it was at least a joint owner of the bridge and therefore liable in damages. This court, in rejecting the landowner's contention, held that the street railway was not a joint tortfeasor since it had no property right in the bridge. This court observed that although the street railway had contributed the major part of the cost of construction of the bridge, and had the privilege of using the bridge to the exclusion of other traffic, the title was entirely and exclusively in the city. It was pointed out that the street railway's exclusive right of user could at any time, in the exercise of the city's police power, be terminated or modified so as to open the bridge to other vehicular traffic. In the absence of contract provisions requiring a different result, and we have none here, it is difficult to find a distinction between the bridge case and the tunnel case before us. If, in the absence of controlling contract provision, a substantial contribution by a public transportation utility to the construction of a bridge along a public street gives it no property right in the structure, it is reasonable to conclude that the same result should follow where a tunnel is built in and as an integral part of a public street even though no part of the cost of the tunnel is paid by the city.

Our conclusion that title to the tunnel structure is vested exclusively in the city is supported by decisions of other jurisdictions. In considering the applicability of foreign decisions, we must bear in mind these controlling facts which are present in the instant case:

(1) The tunnel walls and ceiling constitute an integral part of the reconstructed street since they are essential to the street structure as retaining walls to prevent slides or cave-ins of the surrounding earth.

(2) The tunnel is necessary and of utility not merely for the operation of the street railway's cars but also for all other forms of public vehicular traffic which may presently or subsequently be allowed on that portion of the street.

(3) Although under M. S. A. 220.07 of the Brooks-Coleman Act the street railway has an indeterminate permit to operate a public street transportation system, its right of exclusive user of the tunnel route, pursuant to § 220.09, is subject to modification, or even termination, if the city council by ordinance or resolution requires a change or removal of that particular streetcar line or designates a different streetcar route as a substitute for the tunnel route.[1]

In the light of these controlling facts, we turn to foreign decisions involving analogous questions of title. First we have those cases concerning the allocation of title to the pavement laid on a public street by a street railway at its own expense. In Pennsylvania Steel Co. v. New York City Ry. Co. (C. C. S. D. N. Y.) 191 F. 216, the city made certain claims against the street railway for the amount spent in paving the portions of the street which the street railway was required to maintain. The amount to be allowed depended upon who held title to the stone blocks originally laid by the railway at its own expense which were removed in the process of repaving. The court, in holding that the blocks belonged to the city, said (191 F. 222):

"* * * When originally laid, it became a part of the street surface of a public highway, and can in no sense be said to have continued to belong to the railroad company. The city would have had the right to retain its title to it, and to have used it for the same or other work, instead of inviting bidders for the work to make allowances for it, and instead of turning it over to the successful bidder." (Italics supplied.)

In two other cases the question was whether such pavement was taxable as the tangible property of the railway. In People v. Chicago Rys. Co. 369 Ill. 128, 132, 15 N. E. (2d) 705, 707, the court said:

___

[1]As to the effect of any explicit and unequivocal contract provisions which might be impaired (none are present here), compare §§ 220.07 and 220.09; and see, Minneapolis St. Ry. Co. v. City of Minneapolis, 229 Minn. 502, 40 N. W. (2d) 353, appeal dismissed, 339 U. S. 907, 70 S. Ct. 574, 94 L. ed. 1335.

"* * * Although the companies pay taxes on the component material while in their possession prior to being incorporated into the paving strips, such material does not retain the character of taxable tangibles when laid in the street. *It then becomes an integral part of the pavement and belongs to the city.* Upon the termination of the contract, by expiration or any other means, the companies would have no right to remove the paving strips." (Italics supplied.)

Finally, in People ex rel. Buffalo & Lake Erie Traction Co. v. State Board of Tax Commrs. 209 N. Y. 496, 499, 103 N. E. 776, 777, the court, in reaching the same conclusion, made this pertinent statement:

"* * * It would be a strange arrangement, indeed, which should vest part of the ownership of a street pavement in a municipal corporation and part in a street railroad company."

In People ex rel. New York, O. & W. Ry. Co. v. State Board of Tax Commrs. 215 N. Y. 434, 109 N. E. 547, L. R. A. 1916B, 1225, involving for taxation purposes the question of title to a subway and 2 overhead bridges which a railroad, partly at its own cost, had been compelled to construct to carry streets over and under its roadbed, it was held that the subway and bridge structures, *belonged to the city because they were a part of a public street and because the railroad had no control over the same and could not remove or alter them except upon authority of the proper municipal officials.* The court so held despite the fact that there was a physical connection between the tunnel and bridge structures and the railroad's right-of-way.[2]

---

[2]It is otherwise, as pointed out by the same court in the earlier case of People ex rel. New York & H. R. Co. v. Commrs. of Taxes and Assessments, 101 N. Y. 322, 4 N. E. 127, when a railroad by legislative act is compelled to construct a tunnel *for the exclusive uses and purposes of the railroad company* and where the tunnel is in fact an essential and necessary part of the railroad but which, absent the railroad's right-of-way, is not a necessary part of the public street. In People ex rel. Lehigh Valley Ry. Co. v. Woodworth, 296 N. Y. 288, 73 N. E. (2d) 26, the New York court held that a bridge erected by the railroad on its own right-of-way—*its own land—to carry only its own railroad traffic,* was property of the railroad in its entirety despite the fact that the city contributed to the cost and a city street ran under the bridge.

The fact that the street railway here was required by the 1905 resolution and agreement to construct the Selby Avenue tunnel at its own cost is of itself of no significance since it is recognized that *the device of compelling a utility to provide a street improvement at its sole expense is but an exercise of the taxing power and is in effect a substitute for a tax levy* upon street railway property for street improvement purposes.[3] Courts have also recognized that, although the cost of a street construction such as the deepening or remodeling of a tunnel may properly be carried on the books of a street railway as part of its capital account and may be included in the price to which a street railway may become entitled in the event of a sale of all its assets to the city, such capitalization of the costs and such right of reimbursement in the event of sale have no bearing upon the allocation of title to the tunnel since the street railway's right of user in the tunnel, as a part of a public street, is nothing more than a mere indeterminate privilege or license.[4]

The street railway herein admits it has no rights of ownership in the public street, Selby Avenue, but it does claim the ownership of the tunnel structure. It would indeed be a strange and unreasonable conclusion to hold that a street railway owned the walls and ceiling of the tunnel and the city the street which forms the floor of it. As already noted, the tunnel walls and ceiling constitute an integral part of the street since they are essential as retaining walls to prevent slides or cave-ins of the surrounding earth. Furthermore, the tunnel is necessary and of utility not only for streetcar traffic but for public traffic in general. Clearly, a structure which is thus an integral part of the public street itself falls into a different classification from that of street railway equipment, such as rails, ties, poles, and electrical wiring which is necessary only for streetcar operation and is of no utility, but rather an impediment, for general traffic.

---

[3]See, Chicago Rys. Co. v. Gill, 366 Ill. 605, 10 N. E. (2d) 319; People ex rel. Buffalo & Lake Erie Traction Co. v. State Board of Tax Commrs. 209 N. Y. 496, 103 N. E. 776.

[4]See, Chicago Rys. Co. v. Gill, *supra;* People ex rel. Buffalo & Lake Erie Traction Co. v. State Board of Tax Commrs. *supra.*

Pursuant to our holding in the Bruer case,[5] and in accord with the foregoing decisions of other jurisdictions, we conclude that (where the issue of title is not controlled by statute or by express contract provision) the title to a tunnel or other structure or improvement which is incorporated as an essential part of a public street—and as such is necessary and of utility not merely for the operation of a street railway system but also for general vehicular traffic which may presently or subsequently be allowed on the street—is vested exclusively in the city despite the fact that the construction cost thereof has been paid in whole or in part by the street railway company, and despite the further fact that the cost thereof has been properly carried on the company's books as a part of its capital account, and this holds true even though the company might, in some cases, in the event of a sale of all its assets to the city, be entitled to include such costs in the price.

■ The street railway, in support of its contention that it has a continuing and intangible right of user in the tunnel as long as the structure lasts, relies heavily on the fact that under the Brooks-Coleman Act (originally enacted by L. 1921, c. 278, now M. S. A. 220.01 to 220.19), with particular reference to §§ 220.07 and 220.08, its street railway franchise has been converted into an indeterminate permit. As applied to the tunnel route herein the contention is without merit. We have already pointed out that pursuant to § 220.09, the indeterminate permit provided by § 220.07, as applied to a particular route, is subject to modification or even termination if the city, through its governing council, requires a change or removal of a particular line or designates a substitute route. The street railway's indeterminate right of continuing user in the Selby Avenue route, inclusive of the tunnel, terminated in 1953 when the city council by resolution granted *the street railway's specific request* that it be permitted to discontinue and abandon streetcar service on Selby Avenue and to substitute motor bus service over a route other than through the tunnel. Since that officially approved discontinuance and abandonment, the street railway has not used the tunnel

---

[5]Bruer v. City of Minneapolis, 201 Minn. 40, 275 N. W. 368.

for any purpose and no one can seriously contend that it can of its own volition regain its former right of indeterminate user therein without first obtaining the official approval of the city council. See, In re Madison Rys. Co. (7 Cir.) 102 F. (2d) 178.[6] Whether the street railway may in the future be permitted to operate its motor buses through the tunnel is a question expressly left to local determination by § 221.15.

■ We come to the final question of restoration of Selby Avenue to its former condition. No present significance is to be attached to the proviso in the 1907 acceptance resolution stating that the street railway shall restore and pave the streets torn up for the construction of said tunnel at such time and in such manner as the commissioner of public works shall direct. This proviso cannot reasonably be construed to have been intended to apply to the indefinite future. It undoubtedly was intended to do nothing more than to require the street railway to complete the tunnel construction work in such a manner that the tunnel pavement, curbing, etc. would be connected in a workmanlike manner with the regular street pavement adjoining the tunnel at its respective entrances.

The court did not err in requiring the street railway to remove its rails, ties, wires, electrical installations, etc. from the tunnel structure without doing any unnecessary damage to said structure. The general rule is that after the abandonment or other termination of service the city may require the franchise or indeterminate permit holder to remove such installation from the public streets.[7]

■ The trial court did not err in refraining from requiring the street railway to restore Selby Avenue to its prior condition by removing the tunnel structure. Although we concur in the result, we

---

[6]In In re Madison Rys. Co. (7 Cir.) 102 F. (2d) 178, involving an abandonment in fact of an entire street railway system and a substitution therefor of motor bus transportation, all without any formal order of approval by the proper authorities, the court held that such abandonment terminated all intangible rights theretofore possessed by the company under its indeterminate permit.

[7]Pennsylvania Dept. of Highways v. Pennsylvania Public Utility Comm. 173 Pa. Super. 581, 98 A. (2d) 199.

do not concur in the apparent reason adopted by the court. Since the tunnel structure became an integral part of the street, with the result that the title thereto was exclusively vested in the city, the street railway was under no legal obligation and in fact had no legal right to remove the tunnel structure. In the absence of specific contract or statutory provision to the contrary, a street railway company operating under a franchise or under an indeterminate permit has no right or duty upon the termination of streetcar service to remove anything incorporated as a part of the street, and its right and duty of removal is limited to property or equipment which it owns and which is of utility primarily in operating streetcars and is not an integral part of the street.

Subject to this opinion, the judgment of the trial court is affirmed.

Affirmed.