### STATE v. MODERN BOX MAKERS, INC.[1]

March 24, 1944.

No. 33,680.

[1]Reported in 13 N. W. (2d) 731.

42

*Guesmer, Carson & MacGregor,* for appellant.

*R. S. Wiggin,* City Attorney, and *John F. Bonner* and *Leo P. McHale,* Assistant City Attorneys, for the State.

MAGNEY, JUSTICE.

In a complaint filed in the municipal court of the city of Minneapolis, defendant was charged with violation of the zoning ordinance. It was convicted and appeals from the judgment.

The complaint, in effect, charges that defendant maintained a building and engaged in a commercial business in an area zoned as residential. The area involved was originally a part of the village of Richfield, which was annexed to the city of Minneapolis in 1927. In 1929, the city council adopted an ordinance zoning the district which was formerly the village.

In 1907, John W. Sharpe, a wholesale poultry dealer, purchased 14.6 acres of vacant property lying within the village limits. The property was acquired to take care of the overflow of live poultry in the fall of the year. He erected two frame buildings to house the poultry. In 1922, he razed these buildings and erected the structure now occupied by defendant. The building is of frame construction, part of it about 50 x 100 feet and the other part 50 x 124 feet. The new building was used for fattening and dressing poultry. Because of ill health, Sharpe retired from business in 1931 or 1932 and leased the building to another poultry dealer for a two-year term. After four or five months, the tenant discontinued the use of the property. A road show then stored its equipment in the building six months out of the year for two years. After that the building was unoccupied until August 1940, when defendant took possession under a lease from Sharpe. It was then manufacturing fiber and corrugated wood-cleated boxes. In 1941, it commenced manufacturing boxes for war material. In the fall

of 1942, it entered into an earnest money contract to purchase the property, and on January 1, 1943, received the deed. A small concrete block addition to the building was erected in June 1942 and another in August and September of the same year. The record is silent as to whether or not these additions were erected without first having secured a building permit. The court sustained defendant's objections to all questions along this line.

Within a block of the building is a fine residential district known as Edgewater Boulevard, with homes valued at from $10,500 to $13,500.

The ordinance claimed to have been violated reads in part as follows:

"All those lands in the City of Minneapolis [lands described], shall be and are hereby divided, for the purposes of this ordinance, into Districts known as Use Districts, Height Districts and Density Districts, and such districts, and their boundaries, shall be as shown upon the *maps attached hereto* and made a part of this ordinance." (Italics supplied.)

Defendant contends that no maps were attached to the ordinance at the time of its passage and that consequently there was no law prohibiting the operation of a manufacturing plant on the premises in question. It also contends that even if the maps were attached to the ordinance, as its wording indicates, the ordinance was unnecessary, unreasonable, and arbitrary as to defendant and the property involved, and therefore void.

The original ordinance was designated at the trial as Exhibit B. It is an amendment of the Minneapolis zoning ordinance passed in 1924. The maps were designated and referred to as Exhibit B-1.

The ordinance in question recites that the maps were attached thereto and made a part thereof. That recital creates a presumption that the maps were attached to the ordinance when it was adopted. In City of Duluth v. Krupp, 46 Minn. 435, 436, 49 N. W. 235, 236, the charter of the city had a provision that "no ordinance shall be passed at the same meeting at which it was presented, except by the unanimous consent of all the members present, which

shall be noted on the records." The records did not show that unanimous consent was given for the passage of an ordinance which required such consent. This court stated:

"* * * these records do not affirmatively show that the ordinance in question was first introduced at the meeting at which it was passed; and, as every presumption obtains in favor of the validity of an ordinance that there is in favor of the validity of an act of the legislature, the presumption, in the absence of proof to the contrary, is that it was introduced at some prior meeting."

In Miesen v. Canfield, 64 Minn. 513, 516, 67 N. W. 632, 633, Mr. Justice Mitchell states:

"* * * One thing is well settled by the decisions of this court, viz. that the presumption that a properly authenticated bill was passed in accordance with the constitution is not overcome by the failure of the journals to show any fact which is not specifically required by the constitution to be entered therein."

In 4 Dunnell, Dig. & Supp. § 6787, this language is used:

"In the absence of affirmative evidence to the contrary it will be presumed that an ordinance was regularly and legally enacted."

Section 10 of Chapter IV of the city charter provides:

"A copy of the record of any ordinance or resolution heretofore passed and recorded or that may hereafter be passed, certified by the Clerk and verified by the seal of the city, any copy thereof published in the official paper of the city, or printed in the books containing the official proceedings of the City Council, or published in any compilation of ordinances made under direction of the City Council, shall be prima facie evidence of the contents of such ordinances and of the regularity and legality of all proceedings relating to the adoption and approval thereof, * * *."

The presumption of validity is not conclusive, and defendant offers proof to overcome it. It claims that Exhibit B shows no perforation or other evidence that Exhibit B-1 was at any time at-

tached to it, and insists that Exhibit B-1 was not before the council at the time the ordinance was passed. It is true, Exhibit B shows no perforation or other evidence that Exhibit B-1 was at any time attached to it. That, however, is not sufficient to overcome the presumption that at the time of its adoption Exhibit B-1 was attached to Exhibit B. Defendant has the burden to show that Exhibit B-1 was not attached to Exhibit B at the time it passed the council. The fact that the original ordinance contains no pinholes or staple holes is not sufficient. There are other methods or means of attaching, such as by clips, rubber bands, and strings. "Attach" is defined by Webster's New International Dictionary (2 ed. 1939) thus: "To bind, fasten, tie, or connect; to make fast or join; as, to *attach* one thing to another by a string, by glue, etc." The antonyms of "attach" may aid in defining it. They are: "Separate, detach, remove." If Exhibit B-1 at the time of the adoption of the ordinance was attached to it in any manner here suggested, the ordinance is complete, and there was no omission, as claimed by defendant. The presumption of validity has not been overcome by defendant. Courts will be slow to hold an ordinance invalid which has been in operation and unchallenged for 13 years, and under which, as here, valuable rights have accrued, which would be destroyed if the ordinance were held invalid.

Since we have determined that defendant has failed to overcome the presumption that Exhibit B-1 was attached to Exhibit B when the ordinance was adopted, it may be unnecessary to consider the contention made by it in further support of its claim to the contrary and that Exhibit B-1 was not before the council at the time the ordinance was passed. Herman E. Olson, the city planning engineer, testified that the maps were prepared in his office, that they were before the committee of roads and bridges at its meeting on February 19, 1929, and before the city council at its meeting of March 8, 1929, when the ordinance was adopted. Defendant also claims that the various colors on Exhibit B-1, designating various uses, were placed on the maps after the ordinance had been passed, and bases its claim on the testimony of Joseph W. Zalusky,

employed by the planning commission, who worked on the maps. His testimony follows:

"Q. And did you prepare any of those maps, or is any of the work on those maps your work?

"A. I did some of the work on it, yes.

"Q. And what work did you do?

"A. I put the lettering on here, the title of the map and also the colored conventions of the maps.

 * * * * *

"Q. And after you completed the work that you have indicated, did you do anything to the maps, deliver them anywhere?

 * * * * *

"The Witness: These maps were delivered from our office to the office of the City Clerk.

"Q. (Mr. McHale) By whom?

"A. I took them down there.

"Q. And when?

"A. A short time after the ordinance was passed, I would say."

From this testimony, no conclusion can be drawn that Zalusky colored the maps after the ordinance had been passed. He was asked if he delivered the maps anywhere, and he said that he delivered them to the office of the city clerk. The records show that at the meeting of the roads and bridges committee of the city council certain property owners appeared to protest the planning commission's recommendation of zoning at Fifty-eighth street and Lyndale avenue. The coloring must have been on the maps at that time as a basis for the protest. Furthermore, Zalusky testified that it was customary in a project like this to have the maps before the city council committee; that they go back and forth a number of times before they are finally accepted; and that they then go in for final approval and are passed by the council.

The ordinance as passed was filed with the city clerk in the lower vault where original ordinances are kept. The maps were placed in a tin container labeled "Original Zoning Map of Richfield

Annexation," and kept by themselves in the vault on the first floor. The maps were too large to be filed in the regular ordinance file. They have not been out of the clerk's office at any time. There is nothing in the record relative to the procedure in the adoption of the ordinance or in the manner of custody after its adoption that would justify holding it invalid. The maps were available at all times, as a part of the ordinance, for public inspection, and showed how this property was zoned. The record does not indicate that defendant had difficulty in securing the ordinance, Exhibit B, and the maps, Exhibit B-1.

In State ex rel. Taylor v. City of Jacksonville, 101 Fla. 1241, 133 So. 114, it was contended, substantially as claimed here, that it did not appear that the zoning map was approved by the council or that it was made a part of the ordinance or attached to the ordinance as passed, or that the map was drawn and filed as required by law, or that it was properly connected with the ordinance. The Florida court disposed of the matter as follows (101 Fla. 1245, 133 So. 116):

"This contention in its entirety has reference to proceedings generally essential to the enactment of a valid ordinance but the ordinance on its face appears to have been regularly enacted and all requirements essential to its validity complied with. Where this is the case all presumptions will be indulged in favor of its validity and if attacked, the burden is on him who makes the attack to establish its invalidity or irregularity."

■ Defendant finally contends that the ordinance is arbitrary and unreasonable in its application to the property here involved. It was zoned in 1929. With the exception of the frame building erected in 1922 and Sharpe's residence, the property was then vacant. The council determined to zone it as residential. The general rule is that if reasonableness of an ordinance is debatable, courts will not interfere with the legislative discretion. The development of the district demonstrates that the council acted wisely. Beautiful homes have been erected within a block of defendant's building. The photographs introduced in evidence show

a fine residential district. These homeowners purchased their properties and built their homes in this neighborhood because it was zoned as residential. To now remove the four acres here involved from the zoned area and permit commercial or manufacturing establishments would be a grave injustice to those who live in the neighborhood. Eventually, the property may become the worst of all eyesores, a wrecked car lot, if this ordinance should be held invalid. No injustice is being done defendant. It did not purchase the property until the latter part of 1942, 13 years after zoning. For more than two years of occupancy before it purchased the property, defendant must have been fully aware of the beautiful homes in the vicinity. It claims that it did not know the area had been zoned as residential until after it became the owner of the property. Yet in May 1941, when a need for heavier motors arose and it became necessary for defendant to install new conduits, F. M. Tripp, who was engaged to do the work, informed Paul F. Boeye, defendant's president, that the approval of the planning commission would be necessary, as the property was termed residential. Thereupon, on June 1, 1941, defendant, through Boeye, addressed the following letter to the planning engineer:

"We have leased from Mr. J. W. Sharpe a small building located between 57th and 58th on Cedar Avenue, Minneapolis, in the center of his ten acres. We have been using this building for light manufacturing.

"We would like a permit granted for a period of one year. We need a manufacturing permit so that our electrical system can be passed by the city inspectors.

"We wish you would give this matter your serious consideration as we desire to continue our present manufacturing at this location."

On June 13, 1941, the council granted permission "to operate a manufacturing plant, on a year-to-year basis in existing bldg. located in residence district at 5720 Cedar Ave." It is difficult to take seriously defendant's claim that it did not know this property was zoned as residential when it made the purchase. With refer-

ence to the time defendant purchased the property, Boeye was asked:

"Q. Did you know where the factory was located was zoned?

"A. Not definitely, no.

"Q. Did you know that there was such a thing as a zoning ordinance?

\* \* \* \* \*

"A. Yes, I knew at that time there was a zoning ordinance."

Whether defendant knew or did not know is immaterial. In 1943, 13 years *after* the zoning ordinance was adopted, it was a newcomer to the district, and *now* it claims that the ordinance is unnecessary, arbitrary, and unreasonable. Whether this is so must be determined from the facts as they existed at the time the ordinance was adopted, and from those facts we find no basis for the claim. Mr. Sharpe, the owner of the property in 1929, made no objection to the ordinance, and defendant is in no position, equitable or otherwise, to claim that an injustice is being done it.

The power of a city council to adopt zoning ordinances is so well recognized that it is unnecessary to cite authorities in support thereof. That such ordinances must be reasonable and not arbitrary is equally well recognized. Village of Euclid v. Ambler Realty Co. 272 U. S. 365,. 47 S. Ct. 114, 71 L. ed. 303, 54 A. L. R. 1016. In 37 Am. Jur., Municipal Corporations, § 306, the law is thus stated:

"While police regulations of the character here considered are subject to judicial scrutiny upon fundamental grounds, yet a considerable latitude of discretion must be accorded to the lawmaking power; so long as the regulation in question is not shown to be clearly unreasonable and arbitrary, and operates uniformly upon all persons similarly situated in the particular district, the district itself not appearing to have been selected arbitrarily, it cannot be judicially declared that there is a deprivation of property without due process of law, or a denial of the equal protection of the laws within the meaning of the Fourteenth Amendment. On the other

hand, municipal regulations as to the location of particular businesses within the municipality are invalid where, under the circumstances, they constitute an unreasonable regulation or interference not warranted in the public interest, where they unnecessarily or arbitrarily interfere with property rights, and where they are indefinite and uncertain."

■ Defendant further contends that the property should have been zoned under the power of eminent domain. No reason is apparent at this time why the city in 1929 should have condemned this property instead of zoning it in the exercise of its police power. In State ex rel. Beery v. Houghton, 164 Minn. 146, 148, 204 N. W. 569, 54 A. L. R. 1012, where this court held that zoning should preferably be exercised under the police power, it said: "If restricted residential districts are to be established, there are substantial reasons why the result should be accomplished through the exercise of the police power."

Other questions have been raised on this appeal, but in view of our holding it is unnecessary to discuss them.

Defendant is at present engaged in manufacturing war supplies. It feels that the ordinance should be held invalid in order that its war program may not be interrupted. If defendant makes application for a temporary permit to operate, as it did in 1941, an interruption may be avoided.

Judgment affirmed.