APPALACHIAN POWER CO., *a corporation*

*v.*

THE CITY OF HUNTINGTON, *etc.*

(No. 13442)

Decided December 20, 1974.

*James, Wise, Robinson & Magnuson, E. Glenn Robinson and Charles R. McElwee, Vinson, Meek & White, E. Dennis White, Jr.,* for appellant.

*Maxwell W. Flesher, Campbell, Woods, Bagley, Emerson, McNeer & Herndon, Robert K. Emerson* for appellee.

NEELY, JUSTICE:

This is an appeal by the Appalachian Power Company from an adverse ruling by the Circuit Court of Cabell County in a declaratory judgment action. The purpose of the declaratory judgment suit was to determine whether the appellant Appalachian Power Company or the appellee City of Huntington is liable for the cost of relocating Appalachian's power lines as required by an Urban Renewal Plan adopted by the City of Huntington. Numerous ordinances and the State Urban Renewal Authority Law are raised by the parties, but the Court finds that only a 1954 franchise from the City to Appalachian is relevant to the rights of the parties. As the 1954 franchise is silent upon the subject of relocation costs, the Court holds that the matter is governed by the common law, and the judgment below against Appalachian is affirmed.

This case arose when the City directed Appalachian to relocate its power lines because of an urban renewal plan. *W. Va. Code,* 16-18-1 *et seq.,* "The Urban Renewal Authority Law," enacted by the Legislature in 1951 creates, upon approval of the local governing body, an Urban Renewal Authority in any community where one

or more slum or blighted areas exists. An Urban Renewal Authority is defined as "a public body corporate and politic, exercising public and essential government functions, and having all the powers necessary or convenient to carry out and effectuate" an Urban Renewal Plan. *W. Va. Code*, 16-18-5 [1951]. The Authority may include in its Plan a program to "eliminate unhealthful, insanitary (sic) or unsafe conditions, lessen density, reduce traffic hazzards, eliminate obsolete or other uses detrimental to the public welfare, or to otherwise remove or prevent the spread of blight or deterioration * * *." *W. Va. Code*, 16-18-25 [1957].

Pursuant to this statutory authority the City of Huntington created an urban renewal authority on October 6, 1958 which prepared a Plan designated as "Downtown Project No. 1" which the City Council approved on October 1, 1968 and later amended on February 1, 1971. The pertinent stated objectives of the Plan are to:

"d. Provide certain urban amenities within a framework of positive environmental conditions to meet requirements of a healthy, contemporary downtown area;

"e. Promote a cohesive and compatible urban design for the area through the provisions of architectural design, site planning and landscape design of the highest quality in the treatment of buildings, open spaces and streetscape;

. . . . . . . . .

"h. Provide for all streets a high level of public and private improvements, including street-lighting, *underground utilities*, and landscape development; . . . [emphasis supplied]

. . . . . . . . .

"j. Provide improved pedestrian circulation and open space."

On June 16, 1971 the City Council adopted an ordinance directing that Appalachian and other public utilities move certain facilities in the downtown renewal area at their own expense.

The Appalachian Power Company is a successor corporation to the Appalachian Electric Power Company, which in turn succeeded the Consolidated Light and Railway Company. In 1909 the City Council of Huntington granted a utility franchise to Consolidated Light and Railway Company to use the city streets and alleys for the purpose of distributing electricity to the city. Appalachian Electric Power Company acquired this franchise by mesne assignment and continued to operate under it until May 10, 1954, when the City Council granted Appalachian Electric Power Company a new franchise for a fifty year term. As consideration for the new franchise the City received a $600 a month credit on Appalachian's charges for electric power supplied to public buildings.

In 1947, long before the new 1954 franchise was granted, the City Council adopted a general ordinance relating to special privileges granted to franchise holders. This ordinance provided that "permittees" could be required by the city to relocate public utility equipment but that the City would pay for relocations that it requested.

The applicable provision said in Section 3:

> "A permittee may be required at any time by the city engineer to make any necessary change in the construction or location of a permitted use required in connection with any change of street by the city, or in connection with the authorized location or change of location of public utility service lines, pipes, poles or other equipment. Any change in construction or location required by the city shall be paid for by the city, and any change in construction or location required by a public utility shall be paid for by the public utility for whose benefit such change is required."

However, Section 2(e) of the 1947 ordinance provided that:

> "'Permittee' shall mean a person to whom or which is granted a special privilege; *provided,*

*however, that 'permittee' as herein defined, shall
not include any public utility operating under a
prior franchise."* (Emphasis supplied.)

It is argued by the City that the 1947 ordinance did not
apply to Appalachian because at the time the ordinance
was enacted Appalachian was operating under the "pri-
or" 1909 franchise. The City supported this contention
by demonstrating that Appalachian never paid the vari-
ous fees required of permittees as set forth in other
sections of the 1947 ordinance. This Court agrees with
the City's contention and finds that the 1947 ordinance
has no bearing one way or the other upon the disposi-
tion of this case. The Court finds that the 1947 ordi-
nance was not incorporated by reference into the 1954
franchise either explicitly or by implication.

On April 29, 1970 the City Council amended Chapter 15
of the *Code of the City of Huntington,* 1964, relating to
franchises and special privilege permits. Section 15-20
provides as follows:

"A franchise holder or permittee may be re-
quired at any time by the City Manager to make
any necessary change in the construction or loca-
tion of a franchise or special privilege which may
be required in connection with any change of
street by the City, or in connection with the au-
thorized location or change of location of public
service lines, pipes, poles or other equipment.
Any change in construction or location required
by the City shall be paid for by the City, and any
change in construction or location required by a
public utility shall be paid for by the public utili-
ty for whose benefit such change is required."

However, on June 22, 1970 the City Council further
amended Chapter 15 by adding Section 15-23 which
states:

"The provisions of this chapter shall not apply
to any public utility whose rates are regulated
by the Public Service Commission of West Virgin-
ia and who has heretofore been, or may hereaf-
ter be, granted by separate ordinance a franchise

for a period in excess of ten years under which there is a stipulated annual or monthly franchise fee."

Appalachian refers to these amendments as the "nullification" ordinance and maintains that they unlawfully attempted to negate the terms of the 1947 ordinance which provided compensation for relocation expenses. This argument is without merit because the 1947 ordinance never applied to Appalachian.

A franchise is a contract between a governing body and a private individual or corporation. As a contract, it is binding upon both parties and enforceable unless contrary to public policy. *Dobbins v. Los Angeles*, 195 U.S. 223 (1904). Appalachian would have had a cause of action against the City had the 1970 amendment to Chapter 15 in any way imposed terms upon the exercise of Appalachian's franchise which were less favorable than the terms granted in 1954. However, it is irrelevant that the 1970 terms concerning other franchise holders were less favorable than the 1947 terms concerning other franchise holders; the whole issue is *res inter alios acta* with regard to Appalachian.

Appalachian next contends that *W. Va. Code*, 16-18-27 [1957] regarding the power of an urban renewal authority to pay compensation for relocation gives appellant the right to receive compensation whenever a renewal project forces relocation of its facilities. *W. Va. Code*, 16-18-27 [1957] says:

> ". . . The authority is authorized to make relocation payments to or with respect to persons (including families, business concerns and others) displaced by an urban renewal project, for moving expenses and losses of property for which reimbursement of compensation is not otherwise made, including the making of such payments financed by the federal government."

Although there is conflicting precedent interpreting similar provisions in the urban renewal laws of other states, this question is one of first impression in West

Virginia. The Court finds that the clear intent of the Legislature was to make the payment of compensation permissive rather than mandatory. *W. Va. Code*, 16-18-27 [1957] is an omnibus section granting numerous powers to an urban renewal authority. With regard to the power to reimburse for relocation expenses this section of the *Code* is permissive and is not an adequate foundation for a right to receive compensation; it merely authorizes the State to disburse funds under Federal or State programs when such disbursement becomes either desirable or necessary. As the Court holds that this section of the *Code* is permissive and not mandatory, it is unnecessary to reach the further question of whether payment should be made by the governing body or the urban renewal authority.

After disposing of all other arguments, the Court is left with the 1954 franchise agreement between the City and Appalachian. The agreement is entirely silent on the question of which party must pay for the relocation of power lines when the City requires such relocation. The only provision relating to this subject in the franchise ordinance is Section 2 which says:

> "Said lines and appurtenances shall be constructed so as to interfere as little as possible with the traveling public in its use of the streets, avenues, roads, alleys, bridges and grounds for public use. The location of all poles or conduits shall be made under the supervision of the Council of the said City of Huntington, or its duly authorized representative. The Council may at any time require the Grantee to relocate its poles, wires or conduits, and may in its discretion require all or any portion of the conduits and wires within any business or congested area of the City, to be placed underground."

The Court is unable to infer from this section any intent on the part of the parties concerning who should pay the relocation costs. When the subject of payment of costs for relocation is covered by a franchise agreement, the agreement governs; when there is no agreement, the common law governs.

Accordingly the Court must rely upon the common law of this State with regard to apportionment of expenses between governing bodies and public utilities in situations where relocation is required by the governing body. The case of *Appalachian Power Company v. Gainer*, 149 W. Va. 740, 143 S.E.2d 351 (1965) succinctly states the common law and squarely resolves this issue in favor of the governing body. In *Gainer*, two actions were brought in mandamus by the Appalachian Power Company and the Chesapeake and Potomac Telephone Company to require the State Auditor to pay relocation expenses in connection with the construction of an interstate highway under a 1963 act of the Legislature making relocation expenses a cost of highway construction. The respondent State Auditor asserted that the payment of relocation expenses was an unconstitutional use of State funds, but this Court held that in spite of the common law which placed the cost of relocation upon a public utility, the Legislature could by appropriate act provide that relocation be considered a cost of highway construction. At page 754 of the *West Virginia Reports* the Court said:

> "It is clear that, under the common law and but for the provisions of Section 17-b, public utilities could be required, at their own expense, to move their facilities from public streets or public highway rights of way when required to do so by proper public authorities in order to facilitate the relocation, reconstruction or improvement of the public ways on which such public utility facilities were previously located. . . ."

This has long been the common law of West Virginia. *County Court of Wyoming County v. White*, 79 W. Va. 475, 91 S.E. 350 (1917); *City of Benwood v. Benwood and McMechen Water Co.*, 94 W. Va. 724, 120 S.E. 918 (1923).

Accordingly this Court holds that as the 1954 franchise agreement is silent with regard to the apportionment of costs when the City requires relocation, the

question is controlled by the common law and under existing precedent the relocation expenses must be borne by Appalachian.

For the foregoing reasons the judgment of the Circuit Court of Cabell County is affirmed.

*Affirmed.*