**NORTHERN STATES POWER
COMPANY, Appellant,**

v.

**CITY OF OAKDALE, Respondent.**

No. C3–98–867.

Court of Appeals of Minnesota.

Feb. 2, 1999.

George O. Ludcke, Kelly & Berens, P.A., Minneapolis, MN; and Harold J. Bagley, Senior Attorney, Law Department, Northern States Power Company, Minneapolis, MN (for appellant).

James M. Strommen, Daniel J. Greensweig, Kennedy & Graven, Chtd., Minneapolis, MN (for respondent).

Michael A. Hatch, Attorney General, Megan J. Hertzler, Dennis D. Ahlers, Assistant Attorneys General, St. Paul, MN (for amicus curiae Minnesota Public Utilities Commission).

Christopher D. Anderson, Minnesota Power, Inc., Duluth, MN (for amicus curiae Minnesota Power, Inc.).

Harold LeVander, Jr., Maun & Simon, PLC, St. Paul, MN (for amicus curiae Rural Electric Association).

Carla J. Heyl, League of Minnesota Cities, St. Paul, MN (for amicus curiae League of Minnesota Cities).

Considered and decided by HALBROOKS, Presiding Judge, ANDERSON, Judge, and HOLTAN, Judge.

## O P I N I O N

HARVEY A. HOLTAN, * Judge.

Northern States Power Company (NSP) appeals from the district court's grant of summary judgment in favor of the City of Oakdale (the city) in a case involving an ordinance requiring underground electric distribution lines. We affirm.

## FACTS

In the spring of 1997, Imation Corporation requested that NSP provide additional service to its facility located in the City of Oakdale. NSP subsequently informed the city of its intent to construct new overhead electric distribution lines along state highways 5 and 120. NSP's General Rules and Regulations (tariff) § 5.1A provides that "[t]he Company reserves the right to designate the type of facilities to be installed either overhead or underground." The city requested that the lines be installed underground. NSP's tariff § 5.3A provides in relevant part:

> When requested by the customer, group of customers, developer, or municipality to provide types of service that result in an expenditure in excess of the Company designated service installation as provided under Section 5.1, STANDARD INSTALLATION, the requesting * * * municipality will be responsible for such excess expenditure.

NSP agreed to construct the new lines underground if the city would agree to pay the additional costs associated with undergrounding. NSP estimated that undergrounding would cost an additional $338,000, over and above the $190,000 cost of overhead construction.

In July 1997, the city passed an ordinance requiring that any installation of electric distribution systems of less than 15,000 volts be placed underground. Oakdale, Minn.Code of Ordinances §§ 23–40 and 23–41 (July 1997).

NSP was then granted a permit from MnDOT authorizing completion of the project using overhead lines. NSP informed the city that it was not required to obtain a permit from the city because MnDOT had exclusive authority over state trunk highway right-of-ways under Minn.Stat. § 161.45 (1998). NSP offered to amend its franchise with the city so that the additional costs of undergrounding could be paid through a franchise fee collected from NSP ratepayers in the city. The city declined the offer.

NSP began construction of the overhead lines. On the first day of construction, the Oakdale Police Department notified the NSP crew that the construction was in violation of the ordinance, and crew members would be arrested if they did not cease construction. NSP then brought this action seeking a declaratory judgment that the ordinance was invalid and seeking to enjoin enforcement of the ordinance.

The city subsequently agreed to allow NSP to go forward with the overhead construc-

---

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10

tion. The city later amended the ordinance to exclude state trunk highways from the undergrounding requirement. Oakdale, Minn.Code of Ordinances § 23–41 (October 1997). The city then brought a motion to dismiss NSP's complaint for mootness. NSP brought a cross motion for summary judgment on the validity of the ordinance. NSP included with its motion an affidavit detailing future projects in the city that would be affected by the ordinance. One of the projects was scheduled to begin in January 1998, and included 1.2 miles of power line within the city.

Following a hearing, the district court denied the city's motion to dismiss for mootness, denied NSP's motion for summary judgment, and granted summary judgment on the merits in favor of the city. The court concluded that NSP's commission-approved tariffs did not attain the status of general state law, that the ordinance was not preempted by or in conflict with the Minnesota Public Utilities Act (MPUA), Minn.Stat. ch. 216B (1998), and that the ordinance was a valid exercise of the city's power. The court denied injunctive relief accordingly, and the remaining portions of NSP's complaint were dismissed with NSP's assent.

NSP appeals the district court's grant of summary judgment. It alleges that the district court erred in concluding that NSP's tariffs, filed with the Minnesota Public Utilities Commission (the commission), did not assume the status of general state law. It further alleges that the court erred by concluding that the city's ordinance was valid and not in conflict with or preempted by the MPUA and its approved tariffs.

## ISSUES

I. Did the district court err in determining that the filed tariffs did not assume the status of general state law?

II. Did the district court err in determining that the ordinance was valid, and not preempted by or in conflict with state law?

## ANALYSIS

■ On appeal from summary judgment, a reviewing court determines whether any genuine issues of material fact exist and whether the district court erred in applying the law. *Wartnick v. Moss & Barnett,* 490 N.W.2d 108, 112 (Minn.1992). In making its determinations, "the court must view the evidence in the light most favorable to the nonmoving party." *State by Beaulieu v. City of Mounds View,* 518 N.W.2d 567, 571 (Minn. 1994). No deference need be given to the district court's application of the law. *Frost–Benco Elec. Ass'n v. Minnesota Pub. Utils. Comm'n,* 358 N.W.2d 639, 642 (Minn.1984). Statutory interpretation presents a question of law that an appellate court reviews de novo. *Hibbing Educ. Ass'n v. Public Employment Relations Bd.,* 369 N.W.2d 527, 529 (Minn.1985).

### I.

■ NSP argues that the district court erred when it determined that the commission-approved tariffs failed to attain the status of general state law due to procedural deficiencies. We agree.

■ The commission has been granted legislative authority to regulate public utilities and determine whether their rates are reasonable. *See* Minn.Stat. ch. 216B (1998). Ratemaking is a quasi-legislative function. *Peoples Natural Gas Co. v. Minnesota Pub. Utils. Comm'n,* 369 N.W.2d 530, 533 (Minn. 1985). Utilities are required to file schedules with the commission "showing all rates, tolls, tariffs and charges which it has established * * *." Minn.Stat. § 216B.05, subd. 1 (1998). Filings made with the commission by utilities "continue in force until amended by the public utility or until changed by the commission * * *." Minn.Stat. § 216B.09, subd. 3 (1998). The commission's decisions "command the same regard and are subject to the same tests as enactments of the legislature." *Minneapolis St. Ry. Co. v. City of Minneapolis,* 251 Minn. 43, 71, 86 N.W.2d 657, 676 (1957) (citation omitted).

The district court concluded that:

NSP Rules 5.1 and 5.3 never assumed the status of general state law because they were not adopted pursuant to any agency rulemaking proceeding. Their purpose was limited to advising the MPUC of the manner in which this utility would treat all

of its customers. To file these "rules" without benefit of the protections of notice and opportunity for hearing and then claim they have the force and effect of general state law is vastly overstating the purpose and intent of these tariffs.

This court has previously held a filed tariff to be "an inherent part of the lawful rate charged to consumers * * *." *Computer Tool & Eng'g, Inc. v. Northern States Power Co.,* 453 N.W.2d 569, 573 (Minn.App.1990) (holding NSP tariff § 1.4 valid and enforceable), *review denied* (Minn. May 23, 1990). The *Computer Tool* court concluded that the tariff had been "recognized as a reasonable limitation of liability by the agency exclusively empowered by the legislature to make this determination," based upon the tariff's survival through several contested rate changes. *Id.* The same analysis applies here. The tariffs at issue here were originally filed with the commission in 1984. Since that time they have been reviewed and approved through a series of commission ratemaking proceedings, most recently in 1992. *See* MUPC Docket No. E–002/GR–92–1185 (1992). As approved by the commission, the tariffs at issue are not invalid as the product of a procedural defect.

■■■ The city asserts that even if the tariffs are not procedurally invalid, tariff section 5.1 represents an improper delegation of authority from the commission to NSP. The city cites *Northern Pac. Ry. Co. v. State of Minn. ex rel. Duluth,* 208 U.S. 583, 597, 28 S.Ct. 341, 345–46, 52 L.Ed. 630 (1908), for the proposition that the commission could not delegate the authority to determine placement of utility lines to NSP, a private interest. However, *Northern Pac. Ry.* merely states that attempts to contract away police powers through utility franchises are void as against public policy. *Id.* The case does not deal with decisions by a regulatory agency.

> When the [commission] acts in a legislative capacity as in rate increase allocations, balancing both cost and noncost factors and making choices among public policy alternatives, its decision will be upheld unless shown to be in excess of statutory

authority or resulting in unjust, unreasonable, or discriminatory rates by clear and convincing evidence.

*In re Request of Interstate Power Co.,* 559 N.W.2d 130, 133 (Minn.App.1997) (quoting *Hibbing Taconite Co. v. Minnesota Pub. Serv. Comm'n,* 302 N.W.2d 5, 9 (Minn.1980)).

Here, the commission could have reasonably concluded that NSP would be in the best position to determine what type of installation would be most feasible and cost-effective in order to provide adequate, efficient, and reasonable service at reasonable rates. Minn.Stat. § 216B.16, subd. 6 (1998). Given the deference to be accorded the commission decision, its delegation of authority to NSP was not unreasonable.

## II.

NSP asserts that the city did not have legal authority to enact the ordinance in question. NSP further argues that the ordinance is in conflict with and preempted by the MPUA and commission-approved tariffs. We disagree.

■■■ "[M]unicipalities have no inherent powers and possess only such powers as are expressly conferred by statute * * *" or necessarily implied therefrom. *Northern States Power Co. v. City of Granite Falls,* 463 N.W.2d 541, 543 (Minn.App.1990), *review denied* (Minn. Jan. 14 & 24, 1991); *see also Minneapolis St. Ry. Co. v. City of Minneapolis,* 229 Minn. 502, 507, 40 N.W.2d 353, 357 (1949) (examining powers possessed by city).

■■■ Minn.Stat. § 216B.36 (1998) governs municipal regulatory and taxing powers with respect to public utilities and provides in relevant part:

> Any public utility furnishing the utility services enumerated in section 216B.02 or occupying streets, highways, or other public property within a municipality may be required to obtain a license, permit, right or franchise in accordance with the terms, conditions, and limitations of regulatory acts of the municipality, including the placing of distribution lines and facilities underground. * * * All existing licenses,

permits, franchises and other rights acquired by any public utility or municipality prior to April 11, 1974, including the payment of existing franchise fees, shall not be impaired or affected in any respect by the passage of this chapter, except with respect to matters of rate and service regulation * * *.

Minn.Stat. § 222.37 (1998) also deals with municipal regulation of utility line placement and provides in part:

Any * * * power company * * * may use public roads for the purpose of constructing, using, operating, and maintaining lines * * * for their business, but such lines shall be so located as in no way to interfere with the safety and convenience of ordinary travel along or over the same; and, in the construction and maintenance of such line, * * * the company shall be subject to all reasonable regulations imposed by the governing body of any county, town or city in which such public road may be.

NSP contends that the language in Minn. Stat. § 216B.36 about placing distribution lines underground refers only to a municipality's ability to grant a franchise, essentially a contract, requiring undergrounding. *See City of S. St. Paul v. Northern States Power Co.*, 189 Minn. 26, 29, 248 N.W. 288, 290 (1933) (interpreting an ambiguous term in a franchise under contract law). Historically, cities have regulated utilities both by agreement and through exercise of police power. *See Minneapolis St. Ry. Co. v. City of Minneapolis*, 189 F. 445, 452 (D.Minn.1911) (holding that franchise does not limit the city's ability to "regulate and control the manner of carrying on the business of the road, the laying of the tracks, the use of the streets, and the keeping of the equipment"); *Minneapolis St. Ry. Co. v. City of Minneapolis*, 229 Minn. at 512–513, 40 N.W.2d at 360–61 (holding that the power to license, a police power, is separate and not impaired by the franchise, but is subject to the judicially enforceable standard of reasonableness); *Borough of Belle Plaine v. Northern Power Co.*, 142 Minn. 361, 364, 172 N.W. 217, 219 (1919) (holding that municipal regulation of utility may be either unilateral or bilateral);

*see also City of Roswell v. Mountain States Tel. & Tel. Co.*, 78 F.2d 379, 384 (10th Cir. 1935) (distinguishing franchises from the exercise of police power over use of streets and alleys which is generally accomplished through ordinances and resolutions). Thus, the first question to be addressed is whether Minn.Stat. § 216B.36 confers the authority to require undergrounding as a police power or merely a franchise power.

■ The authority of a municipality to require underground placement of utility lines has long been considered a police power. *See, e.g., Northwestern Tel. Exch. Co. v. City of Minneapolis*, 81 Minn. 140, 149–50, 83 N.W. 527, 531 (1900). The *Northwestern Tel.* court stated that

it is not to be doubted that the city council has the plenary power to extend the subsurface district wherever, in the exercise of a fair discretion, it decides that public interests require it to be done.

*Id.* In addition, Minn.Stat. § 222.37 specifically subjects utilities to a municipality's reasonable regulation with respect to placement of lines in the right-of-way. Furthermore, the plain language of Minn.Stat. § 216B.36 provides that a utility "may be required to obtain a license, permit, right or franchise * * *." *See Minneapolis St. Ry.*, 229 Minn. at 512–13, 40 N.W.2d at 360 (construing the power to license as a police power that could not be abdicated through a franchise). If the legislature had intended to limit a municipality's regulation of utilities to that which could be accomplished by franchise, the additional terms license, permit and right would have been unnecessary and meaningless. However, when construing a statute we endeavor to give all provisions meaning. Minn.Stat. § 645.16 (1998). We therefore conclude that Minn.Stat. § 216B.36 confers upon municipalities the power to require electric distribution line undergrounding either through a franchise or through reasonable exercise of its police powers.

We further note that several jurisdictions have recognized local power to regulate utility line placement despite statewide regulation through a PUC. *See U.S. West Communications, Inc. v. City of Longmont*, 948 P.2d 509, 520 (Colo.1997) (upholding municipal or-

dinance requiring utility to relocate its lines underground); *City and County of Denver v. Mountain States Tel. & Tel. Co.,* 754 P.2d 1172, 1176 (Colo.1988) (requiring utility to relocate its lines due to the construction of new sewer lines); *City of Geneseo v. Illinois N. Utils. Co.,* 378 Ill. 506, 510, 39 N.E.2d 26, 30 (Ill.1941) (requiring utility with expired franchise to remove its inoperational power lines); *Detroit Edison Co. v. Southeastern Michigan Transp. Auth.,* 161 Mich.App. 28, 410 N.W.2d 295, 297 (Mich.Ct.App.1987) (requiring utility to relocate its facilities within the projected route of "people mover" upon order of the transportation authority); *Northwest Natural Gas v. City of Portland,* 300 Or. 291, 711 P.2d 119, 121 (Or.1985) (requiring utility to relocate its lines to accommodate construction of a light rail transit system); *Vermont Gas Sys., Inc. v. City of Burlington,* 153 Vt. 210, 571 A.2d 45, 49 (Vt.1989) (requiring gas utility to relocate its lines due to the construction of new storm and sewer lines); *City of Edmonds v. General Tel. Co.,* 21 Wash.App. 218, 584 P.2d 458, 461 (Wash.Ct.App.1978) (upholding municipal regulation requiring utility to place its lines underground at its own expense); *but see Union Elec. Co. v. City of Crestwood,* 499 S.W.2d 480, 483 (Mo.1973) (holding that municipal ordinance requiring undergrounding exceeded its authority and was invalid; regulatory power had been vested in the Public Service Commission); *Public Serv. Co. v. Town of Hampton,* 120 N.H. 68, 411 A.2d 164, 166 (N.H.1980) (municipal power over *transmission* lines preempted by statute placing those powers in regulatory agency) (emphasis added); *In re Public Serv. Elec. & Gas Co.,* 35 N.J. 358, 173 A.2d 233, 239 (N.J.1961) (holding that ordinance requiring undergrounding of electric *transmission* lines was invalid as outside the scope of municipal power) (emphasis added); *Cleveland Elec. Illum. Co. v. City of Painesville,* 10 Ohio App.2d 85, 226 N.E.2d 145, 148 (Ohio Ct.App.1967) (holding construction of public utility facilities cannot be prohibited or unreasonably regulated by municipality where such facilities are constructed in accord with safety standards and meet the standards of the hot wires statute); *Duquesne Light Co. v. Upper St. Clair Township,* 377 Pa. 323, 329, 105 A.2d 287, 290 (1954) (holding utility was not subject to township regulation regarding location and construction of *transmission* lines) (emphasis added); *Vandehei Developers v. Public Serv. Comm'n,* 790 P.2d 1282, 1288 (Wyo.1990) (holding Public Service Commission order controlled over conflicting order of county board; county did not have power to regulate utilities).

NSP argues that we should focus on the provision of Minn.Stat. § 216B.36 that provides:

> All existing licenses, permits, franchises and other rights acquired by any public utility or municipality prior to April 11, 1974, including the payment of existing franchise fees, shall not be impaired or affected in any respect by the passage of this chapter, *except with respect to matters of rate* and service regulation * * * *that are vested in the jurisdiction of the commission by this chapter.* * * *[1]

(Emphasis added.) However,

> [w]hen a general provision in a law is in conflict with a special provision in the same or another law, the two shall be construed, if possible, so that effect may be given to both. If the conflict between the two provisions be irreconcilable, the special provision shall prevail and shall be construed as an exception to the general provision * * *.

Minn.Stat. § 645.26, subd. 1 (1998); *see also Itasca County Bd. Of Comm'rs v. Olson,* 372 N.W.2d 804, 807 (Minn.App.1985) (where possible, a court must give effect to all related statutory provisions). Here the legisla-

---

1. Rate is defined as
 > every compensation, charge, fare, toll, tariff, rental and classification, or any of them, demanded, observed, charged, or collected by any public utility for any service and any rules, practices, or contracts affecting any such compensation, charge, fare, toll, rental, tariff, or classification.

Minn.Stat. § 216B.02, subd. 5 (1998). Service is defined as
> natural, manufactured or mixed gas and electricity; the installation, removal, or repair of equipment or facilities for delivering or measuring such gas and electricity.

Minn.Stat. § 216B.02, subd. 6 (1998).

ture specifically granted municipalities the power to require utility distribution line undergrounding. Moreover, the provision relied upon by NSP clearly only applies to "existing licenses, permits, franchises and other rights * * * acquired prior to April 11, 1974." Minn.Stat. § 216B.36. By the plain language of the statute, the legislature reserved the authority of municipalities to require distribution line undergrounding.

Finally, NSP argues that if Minn.Stat. § 216B.36 grants police powers, then it would be granting a police power to collect fees through licenses and permits—effectively an excise tax. If so, the provision regarding the collection of an excise tax near the end of the statute would be meaningless. Further, it would conflict with the general principle that a city's police powers do not include the power to raise revenue. *See Country Joe, Inc. v. City of Eagan,* 560 N.W.2d 681, 686–87 (Minn.1997) (holding that when a city's real motive is to generate revenue, rather than recouping the administrative costs of regulation, the fee is an illegal tax).

 NSP's argument here assumes that the statute cannot be read to reserve both franchise power and some police powers. The portion of the statute involving collection of fees states:

> Under the license, permit, right, or franchise, the utility may be obligated by any municipality to pay to the municipality fees to raise revenue or defray increased municipal costs accruing as a result of utility operations, or both.

Minn.Stat. § 216B.36. Clearly, the statute can be read to allow for a revenue–generating fee from a franchise and a separate fee for a permit to defray administrative costs. *See* Minn.Stat. § 645.17(1) (1998) (stating that statutes are to be interpreted with the presumption that the legislature does not intend a result that is unreasonable).

 Having determined that Minn.Stat. § 216B.36 provides the city with the statutory authority to require utility line undergrounding, our inquiry as to the validity of the ordinance is not yet complete. NSP contends that the ordinance is not reasonably related to a legitimate objective. We disagree.

 A municipal ordinance is presumed constitutional; the burden is on the party attacking the ordinance's validity to prove an ordinance is unreasonable or that the requisite public interest is not involved, and consequently that the ordinance does not come within the police power of the city. *City of St. Paul v. Dalsin,* 245 Minn. 325, 329, 71 N.W.2d 855, 858 (1955). To prove an ordinance is unreasonable, a complaining party must show that it "has no substantial relationship to the public health, safety, morals or general welfare." *State v. Hyland,* 431 N.W.2d 868, 872 (Minn.App.1988) (quoting *County of Freeborn v. Claussen,* 295 Minn. 96, 100, 203 N.W.2d 323, 326 (1972)). "[I]f the reasonableness of an ordinance is debatable, the courts will not interfere with the legislative discretion." *Id.* (quoting *State v. Modern Box Makers, Inc.,* 217 Minn. 41, 47, 13 N.W.2d 731, 734 (1944)).

The ordinance at issue requires undergrounding for any permanent extension or replacement of distribution lines of 15,000 volts or less. Oakdale, Minn.Code of Ordinances § 23–41 (July 1997). The stated purpose for the ordinance is to

> promote and preserve the general welfare, assure the orderly development of the city, and provide for the safety and convenience of its inhabitants * * *.

Oakdale, Minn.Code of Ordinances § 23–40 (October 1997).

The city asserts that its police power allows it to regulate in the interest of public convenience or general prosperity, including aesthetic considerations. *See County of Pine v. State Dep't of Natural Resources,* 280 N.W.2d 625, 629 (Minn.1979) (holding the Kettle River Wild and Scenic Rivers Ordinance was a valid exercise of police power where it had as its basis aesthetic considerations as well as other traditional zoning objectives, including public safety and limiting pollution); *Naegele Outdoor Adver. Co. v. Village of Minnetonka,* 281 Minn. 492, 499, 162 N.W.2d 206, 212 (1968) (holding that the fact that the billboard regulation at issue reflected a desire to achieve aesthetic ends does not invalidate an otherwise valid ordi-

nance); *Naegele Outdoor Adver., Inc. v. City of Durham,* 844 F.2d 172, 174 (4th Cir.1988) (holding that aesthetic considerations are a valid basis for exercise of the police power over zoning regulation of billboards). While these cases do reflect the position that aesthetic considerations will not invalidate an otherwise valid ordinance, none stand for the proposition that a city may regulate a public utility solely for purposes of convenience and aesthetic value. We decline the invitation to extend the law with respect to municipal regulation of public utilities, and instead apply the more traditional public interest tests of public health, safety, and general welfare. *See Northwestern Tel. Exch.,* 81 Minn. at 147, 83 N.W. at 530; *Holt v. City of Sauk Rapids,* 559 N.W.2d 444, 445 (Minn.App. 1997), *review denied* (Minn. Apr. 24, 1997); *Hyland,* 431 N.W.2d at 872.

Here the city has clearly included public safety and general welfare as interests the ordinance is intended to protect. We do not believe it can be reasonably disputed that overhead electric lines present a significant hazard to the public, especially in this climate. Utility poles in close proximity to the streets increase the likelihood of injuries resulting from traffic accidents. In addition, street obstructions occasioning improvements while repairing, replacing or relocating utility poles increase the risk of accidents. *See City of Edmonds,* 584 P.2d at 461. Furthermore, downed lines as the result of ice or wind storms not only present a hazard on the ground, but also impact the safety and welfare of people in their homes due to loss of power in the winter months. Based on these considerations, we conclude that requiring electric distribution lines to be placed underground reasonably relates to the city's legitimate interest in public safety and the general welfare of its citizenry.

■ Having determined that the city had the authority to require undergrounding under Minn.Stat. § 216B.36, and reasonably exercised that authority, we must next examine how the ordinance impacts NSP's commission-approved tariffs.

■ Since we have determined that the legislature has explicitly granted municipal authority to require distribution line under-

grounding, we do not reach the issue of preemption. *See Mangold Midwest Co. v. Village of Richfield,* 274 Minn. 347, 356, 143 N.W.2d 813, 819 (1966) (defining preemption as the concept of "occupation of the field"). Similarly, when the legislature specifically grants authority to municipalities, the exercise of that authority cannot logically be seen to conflict with state law. *See Northern States Power Co. v. City of Granite Falls,* 463 N.W.2d at 544–45 (stating there is generally no conflict where the ordinance is merely additional and complimentary to or in aid and furtherance of the statute).

Clearly the ordinance and the tariffs conflict. But both the city and NSP claim authority in the MPUA. "The legislature does not intend a result that is absurd, impossible of execution, or unreasonable." Minn.Stat. § 645.17(1) (1998). It would be absurd to interpret the MPUA as granting conflicting authority. Therefore, the extent to which there is conflict is also the extent to which the statutory authority has been exceeded by one of the parties.

We have already determined that the legislature's specific grant of authority to municipalities to require utility line undergrounding must prevail over the general grant of authority to the commission to regulate services. *See* Minn.Stat. § 645.26, subd. 1. Therefore, to the extent that tariff section 5.1A conflicts with the city's ordinance, the tariff must yield.

■ Similarly, tariff section 5.3A is unenforceable to the extent that it would require compensation for the city's valid exercise of its authority to regulate utility line undergrounding under the statute. This comports with the long-held view that a city may regulate a utility without compensation in valid exercise of its police power. *See Detroit Edison,* 410 N.W.2d at 297; *Vermont Gas,* 571 A.2d at 46; *City of Longmont,* 948 P.2d at 521; *Northwest Natural Gas,* 711 P.2d at 121; *Appalachian Power Co. v. City of Huntington,* 158 W.Va. 240, 210 S.E.2d 471, 472 (W.Va.1974); *State ex rel. Rich v. Idaho Power Co.,* 81 Idaho 487, 346 P.2d 596, 598 (Id.1959); *New York City Tunnel Auth. v. Consolidated Edison Co. of New York,* 295

N.Y. 467, 68 N.E.2d 445, 447 (N.Y.1946); *City of Edmonds*, 584 P.2d at 459. The Minnesota Supreme Court has also recognized that legitimate exercise of the police power may prohibit the injurious use of property without compensation. *Lachtman v. Houghton*, 134 Minn. 226, 237, 158 N.W. 1017, 1021–22 (1916).

■ Furthermore, NSP's argument that this uncompensated regulation would perpetrate an unconstitutional taking fails for two reasons. First, "[i]f the regulation is drawn to prevent harm to the public, broadly defined, and seems able to achieve this goal, then a taking has not occurred." *Zeman v. City of Minneapolis*, 552 N.W.2d 548, 554 (Minn.1996) (citing *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 488–93, 107 S.Ct. 1232, 1243–46, 94 L.Ed.2d 472, (1987)). Second, NSP has a remedy at the public utilities commission. NSP may request that the commission allocate the additional costs of undergrounding to the appropriate group of ratepayers.

NSP further contends that a municipality may not require underground placement of electric lines without compensation because such a requirement creates a conflict with NSP's statutory duty not to discriminate as set forth in Minn.Stat. §§ 216B.06–.07 (1998). NSP argues that, by conferring a special benefit on its citizens, placement of power lines underground, without paying NSP for this improvement, the city requires NSP to collect the costs of those improvements from ratepayers across the state. Thus, all ratepayers outside the City of Oakdale are paying a discriminatory rate.

■ While we need not decide whether the city's ordinance will result in unreasonable rate discrimination under Minn.Stat. §§ 216B.03 and .07 (1998), we do note that NSP has a statutory remedy that allows NSP to address discriminatory rate concerns, if any, without interfering with the city's duly-enacted ordinance. NSP may request the commission allocate additional costs of complying with the ordinance to the ratepayers benefiting from the service. *See* Minn.Stat. § 216B.16. This approach is specifically outlined in tariff section 5.3E, which provides in relevant part:

Where special facilities are requested or required by a municipality and payment is not made by the municipality, the excess expenditures will be the responsibility of [NSP's] customers residing within the municipality and will be recovered from those customers through a rate surcharge or other method approved by the Commission.

NSP argues that it should not be required to obtain surcharge approval each time a municipality requires a special installation. NSP cites no authority for this position. The duty to avoid rate discrimination is NSP's duty. *See* Minn.Stat. §§ 216B.06–.07. The commission has approved tariff section 5.3E and NSP is bound by it.

## D E C I S I O N

The district court erred when it determined that NSP's rate tariffs at issue did not attain the status of general state law due to procedural deficiencies. However, the district court correctly determined the ordinance in question was authorized by statute. The ordinance is reasonably related to its stated objective of protecting public safety and is neither preempted by nor in conflict with state law.

**Affirmed as modified.**

HALBROOKS, Judge (concurring in part, dissenting in part).

While I agree with the majority that NSP's rate tariff sections 5.1 and 5.3 have the force of state law, I conclude that Oakdale's ordinance is too broad to be either reasonably related to a legitimate municipal objective or authorized by Minn.Stat. § 216B.36. Therefore, I respectfully dissent.

Oakdale's ordinance is extraordinarily broad. It does not discriminate based on location of power lines or their proximity to public traffic. The ordinance imposes the requirement of underground installation for all electric distribution lines of 15,000 volts or less without regard to any safety or public welfare concerns in a given installation. Further, Oakdale made no findings that underground installation of electric lines would serve the stated public interests. *See U.S.*

*West Communications v. City of Longmont,* 948 P.2d 509, 521–22 (Colo.1997) (listing factors relevant to its determination of the reasonableness of municipal ordinance requiring relocation of utility lines underground). Although it may be true that overhead electric lines present a hazard in some places, the record before us is not developed on this issue. In fact, NSP has argued that underground lines are significantly more difficult to repair, especially in the winter months when the ground is frozen.

In spite of the fact that the ordinance cites public safety and general welfare as its objectives, *see* Oakdale, Minn.Code of Ordinances § 23–40 (1997), it is not tailored to meet those objectives. Even assuming overhead electric lines present the hazards mentioned by the majority, this ordinance is overly broad. Under Oakdale's ordinance, a distribution line to a commercial building, traveling across private property and not in any way near a public road or activity, must be installed underground. This bears no relationship to public health, safety and general welfare. The ordinance goes beyond what is necessary to protect the public. *See Village of Blaine v. Independent Sch. Dist. No. 12,* 272 Minn. 343, 353, 138 N.W.2d 32, 39 (1965) (holding that utilities are subject to municipalities' reasonable exercise of police power to protect the consumer and the public). Indeed, it seems to me the only conceivable purpose for a regulation this broad is aesthetic, and I agree with the majority that municipalities have no authority to regulate utilities for aesthetic ends.

Even assuming overhead lines are generally hazardous, this ordinance exceeds Oakdale's statutory authority. *See Northern States Power Co. v. City of Granite Falls,* 463 N.W.2d 541, 543 (Minn.App.1990) (holding municipalities have only the powers granted them by statute), *review denied* (Minn. Jan. 14, 1991). To interpret the municipal power to require utility line undergrounding as broadly as the city does requires us to ignore the commission's statutory authority to regulate utilities. *See* Minn.Stat. ch. 216B (1996 & Supp.1997); *see also Computer Tool & Eng'g, Inc. v. Northern States Power Co.,* 453 N.W.2d

569, 572 (Minn.App.1990), *review denied* (Minn. May 23, 1990).

Agency powers must be construed in light of the purpose for which they were granted. *State ex rel. Waste Management Board v. Bruesehoff,* 343 N.W.2d 292, 295 (Minn.App. 1984). The commission is charged with the responsibility of balancing the public need for adequate, efficient and reasonable service against the utility's need to meet the cost of providing the service and earn a fair profit. Minn.Stat. § 216B.16, subd. 6 (1996); *Computer Tool,* 453 N.W.2d at 573. The stated purpose of the chapter is to provide

> adequate and reliable services at reasonable rates, consistent with the financial and economic requirements of public utilities and their need to construct facilities to provide such services * * *.

Minn.Stat. § 216B.01 (1996). To interpret Minn.Stat. § 216B.36 as granting a broad new power to require undergrounding conflicts with the chapter's general purpose of localizing regulatory powers in the commission. Minn.Stat. § 216B.01 (1996); *see also* Minn.Stat. § 645.16 (1996) (asserting that legislative intent may be determined by the occasion and necessity for the law, and the object to be attained); Minn.Stat. § 216B.66 (1996) (declaring that the MPUA is complete in itself, and that other statutes are inapplicable to the regulation of public utilities by the commission).

When a general provision of law conflicts with a specific provision, the two should be construed, if possible, to give effect to both. Minn.Stat. § 645.26, subd. 1 (1996). In order to give all provisions of the statute meaning, section 216B.36 must be interpreted to only reserve pre-existing police powers of the municipality to require underground placement of utility lines as part of its authority to regulate the streets and public property. *See* Minn.Stat. § 222.37 (1996). The exercise of those powers is limited to that which is reasonably related to the public interests of public health, safety and general welfare. *See State v. Hyland,* 431 N.W.2d 868, 872 (Minn.App.1988). Since the ordinance here exceeds that authority, it should be declared invalid and its enforcement enjoined. The

foreign authorities cited by the majority are not persuasive to the contrary.

Instances where courts have upheld local regulation of utility line placement have been limited to regulation incidental to major public works projects. *See Detroit Edison Co. v. Southeastern Michigan Transp. Auth.*, 161 Mich.App. 28, 410 N.W.2d 295, 296–97 (Mich. Ct.App.1987); *Vermont Gas Sys., Inc. v. City of Burlington*, 153 Vt. 210, 571 A.2d 45, 46 (Vt.1989); *City & County of Denver v. Mountain States Tel. & Tel. Co.*, 754 P.2d 1172, 1176 (Colo.1988); *Northwest Natural Gas v. City of Portland*, 300 Or. 291, 711 P.2d 119, 121 (Or.1985); *Appalachian Power Co. v. City of Huntington*, 158 W.Va. 240, 210 S.E.2d 471, 472 (W.Va.1974); *City of Philadelphia v. Pennsylvania Pub. Util. Comm'n*, 449 Pa. 402, 296 A.2d 804, 808–09 (Pa.1972); *New York City Tunnel Auth. v. Consolidated Edison Co.*, 295 N.Y. 467, 68 N.E.2d 445, 447–48 (N.Y.1946); *City of Edmonds v. General Tel. Co., Inc.*, 21 Wash.App. 218, 584 P.2d 458, 459 (Wash.Ct.App.1978). Were Oakdale's ordinance related to a public works project, undertaken in the interest of public health and welfare, the issue before us would be significantly different. *See New Orleans Gaslight Co. v. Drainage Comm'n*, 197 U.S. 453, 460–61, 25 S.Ct. 471, 473, 49 L.Ed. 831 (1905) (holding imposition on gas company of the costs of relocating gas pipes to accommodate construction of municipal drainage system was an exercise of the police power essential to the health of the community).

Furthermore, the recent Colorado Supreme Court decision, *City of Longmont*, is both factually and legally distinguishable from the instant case. First, that case involved an ordinance requiring undergrounding of utility lines in conjunction with a public works project undertaken by the city-owned electric utility, undergrounding its own utility lines. *City of Longmont*, 948 P.2d at 513. Second, the ordinance only required undergrounding for those lines that shared utility poles with the city-owned lines. *Id.* Third, the city made specific findings as to how the undergrounding would further the health, safety, and welfare of city residents. *Id.* at 521. Fourth, the city agreed to excavate and back-fill the trench necessary for undergrounding. *Id.* Finally, the Colorado legislature had passed a statute expressly providing municipal regulation over the location of utility poles. *Id.* at 519; *see also* Colo.Rev.Stat. § 31–15–702 (1997).

Although there is no precedent for municipal regulation of utility line placement as broad as Oakdale assumes, many courts have invalidated local ordinances requiring utility line undergrounding. *See Cleveland Elec. Illum. Co. v. City of Painesville*, 10 Ohio App.2d 85, 226 N.E.2d 145, 149 (Ohio Ct.App. 1967); *Vandehei Developers v. Public Serv. Comm'n*, 790 P.2d 1282, 1285–87 (Wyo.1990); *Public Serv. Co. v. Town of Hampton*, 120 N.H. 68, 411 A.2d 164, 166 (N.H.1980); *Union Elec. Co. v. City of Crestwood*, 499 S.W.2d 480, 483–84 (Mo.1973); *In re Public Serv. Elec. & Gas Co.*, 35 N.J. 358, 173 A.2d 233, 239 (N.J.1961).

Oakdale's ordinance does not reasonably relate to a legitimate municipal objective. The ordinance also exceeds Oakdale's statutory authority. Therefore, I would reverse the trial court's judgment.